# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

LAVARIO C. RAY,

       Petitioner,

v.                                    Case No. 3:16-cv-1112-TJC-JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

       Respondents.

_____

## ORDER

## I.   Status

Petitioner, Lavario C. Ray, an inmate of the Florida penal system, initiated this action by filing a pro se Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody. Doc. 1. Petitioner is challenging two state court (Duval County, Florida) judgments of conviction. In State v. Ray, No. 16-2005-CF-4840-BXXX (Fla. 4th Cir. Ct.), Petitioner was convicted of one count of violation of racketeering laws, two counts of conspiracy to traffic in controlled substances, and one count of conspiracy to purchase or possess cocaine with intent to sell. In State v. Ray, No. 16-2005-CF-5567-AXXX (Fla. 4th Cir. Ct.), Petitioner was convicted of two counts of first degree murder and one count of tampering with evidence. Petitioner is serving a life term of

incarceration. Respondents filed a Response, Doc. 26, and a Supplemental Response, Doc. 49 (Resp).[1] Petitioner replied. <u>See</u> Doc. 55. This case is ripe for review.[2]

## II.   <u>Governing Legal Principles</u>

### A. Standard Under AEDPA

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs a state prisoner's federal habeas corpus petition. <u>See</u> <u>Ledford v. Warden, Ga. Diagnostic & Classification Prison</u>, 818 F.3d 600, 642 (11th Cir. 2016). "'The purpose of AEDPA is to ensure that federal habeas relief functions as a guard against extreme malfunctions in the state criminal justice systems, and not as a means of error correction.'" <u>Id.</u> (quoting <u>Greene v. Fisher</u>, 565 U.S. 34, 38 (2011)).

---

[1] Attached to the Response and the Supplemental Response are several exhibits presented in alphabetical order (A-BBB). The Court cites the exhibits as "Resp. Ex."

[2] "In a habeas corpus proceeding, the burden is on the petitioner to establish the need for an evidentiary hearing." <u>Jones v. Sec'y, Fla. Dep't of Corr.</u>, 834 F.3d 1299, 1318 (11th Cir. 2016) (citing <u>Chavez v. Sec'y Fla. Dep't of Corr.</u>, 647 F.3d 1057, 1060 (11th Cir. 2011)). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007) (citation omitted). "It follows that if the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." <u>Id.</u> The Court finds that "further factual development" is unnecessary. <u>Turner v. Crosby</u>, 339 F.3d 1247, 1275 (11th Cir. 2003). Thus, an evidentiary hearing will not be conducted.

The first task of the federal habeas court is to identify the last state court decision, if any, that adjudicated the petitioner's claims on the merits. See Marshall v. Sec'y Fla. Dep't of Corr., 828 F.3d 1277, 1285 (11th Cir. 2016). The state court need not issue an opinion explaining its rationale for the state court's decision to qualify as an adjudication on the merits. See Harrington v. Richter, 562 U.S. 86, 100 (2011). When the state court's adjudication on the merits is unaccompanied by an explanation,

> the federal court should "look through" the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning. But the State may rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision, such as alternative grounds for affirmance that were briefed or argued to the state supreme court or obvious in the record it reviewed.

Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018).

When a state court has adjudicated a petitioner's claims on the merits, a federal court cannot grant habeas relief unless the state court's adjudication of the claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(1),

(2). A state court's factual findings are "presumed to be correct" unless rebutted "by clear and convincing evidence." Id. § 2254(e)(1).

> AEDPA "imposes a highly deferential standard for evaluating state court rulings" and "demands that state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S. 766, 773 (2010) (internal quotation marks omitted). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (internal quotation marks omitted). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id. [at 102] (citing Lockyer v. Andrade, 538 U.S. 63, 75 (2003)). The Supreme Court has repeatedly instructed lower federal courts that an unreasonable application of law requires more than mere error or even clear error. See, e.g., Mitchell v. Esparza, 540 U.S. 12, 18 (2003); Lockyer, 538 U.S. at 75 ("The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."); Williams v. Taylor, 529 U.S. 362, 410 (2000) ("[A]n unreasonable application of federal law is different from an incorrect application of federal law.").

Bishop v. Warden, GDCP, 726 F.3d 1243, 1253-54 (11th Cir. 2013) (internal citations modified).

## B. Exhaustion and Procedural Default

There are prerequisites to seeking federal habeas review. Before bringing a § 2254 habeas action in federal court, a petitioner must exhaust all state court remedies available for challenging his state conviction. See 28 U.S.C. §

4

2254(b)(1)(A). To exhaust state remedies, the petitioner must "fairly present[]" every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review. <u>Castille v. Peoples</u>, 489 U.S. 346, 351 (1989) (emphasis omitted). Thus, to properly exhaust a claim, "state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845 (1999); <u>see also</u> <u>Pope v. Rich</u>, 358 F.3d 852, 854 (11th Cir. 2004) (noting "that <u>Boerckel</u> applies to the state collateral review process as well as the direct appeal process.").

In addressing exhaustion, the United States Supreme Court explained:

> Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available state remedies, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'"opportunity to pass upon and correct" alleged violations of its prisoners' federal rights.'" <u>Duncan v. Henry</u>, 513 U.S. 364, 365, 115 S. Ct. 887, 130 L.Ed.2d 865 (1995) (per curiam) (quoting <u>Picard v. Connor</u>, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L.Ed.2d 438 (1971)). To provide the State with the necessary "opportunity," the prisoner must "fairly present" his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the federal nature of the claim. <u>Duncan</u>, <u>supra</u>, at 365-366, 115 S. Ct. 887; <u>O'Sullivan v. Boerckel</u>, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L.Ed.2d 1 (1999).

<u>Baldwin v. Reese</u>, 541 U.S. 27, 29 (2004).

5

A state prisoner's failure to properly exhaust available state remedies results in a procedural default, which raises a potential bar to federal habeas review. The United States Supreme Court has explained the doctrine of procedural default as follows:

> [A] federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule. See, e.g., Coleman,[3] supra, at 747–748, 111 S. Ct. 2546; Sykes,[4] supra, at 84–85, 97 S. Ct. 2497. A state court's invocation of a procedural rule to deny a prisoner's claims precludes federal review of the claims if, among other requisites, the state procedural rule is a nonfederal ground adequate to support the judgment and the rule is firmly established and consistently followed. See, e.g., Walker v. Martin, 562 U.S. --, --, 131 S. Ct. 1120, 1127–1128, 179 L.Ed.2d 62 (2011); Beard v. Kindler, 558 U.S. --, --, 130 S. Ct. 612, 617–618, 175 L.Ed.2d 417 (2009).

Martinez v. Ryan, 566 U.S. 1, 9-10 (2012). Procedural defaults may be excused at times. Even though a claim has been procedurally defaulted, a federal court may still consider the claim if a state habeas petitioner can show either (1) cause for and actual prejudice from the default; or (2) a fundamental miscarriage of justice. Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010). For a petitioner to establish cause and prejudice,

> the procedural default "must result from some objective factor external to the defense that prevented [him] from

---

[3] Coleman v. Thompson, 501 U.S. 722 (1991).

[4] Wainwright v. Sykes, 433 U.S. 72 (1977).

> raising the claim and which cannot be fairly attributable to his own conduct." <u>McCoy v. Newsome</u>, 953 F.2d 1252, 1258 (11th Cir. 1992) (quoting <u>Carrier</u>, 477 U.S. at 488, 106 S. Ct. 2639).[5] Under the prejudice prong, [a petitioner] must show that "the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness." <u>Id.</u> at 1261 (quoting <u>Carrier</u>, 477 U.S. at 494, 106 S. Ct. 2639).

<u>Wright v. Hopper</u>, 169 F.3d 695, 706 (11th Cir. 1999).

Without a showing of cause and prejudice, a petitioner may receive consideration on the merits of a procedurally defaulted claim if the petitioner can establish that a fundamental miscarriage of justice, the continued incarceration of one who is actually innocent, otherwise would result. The Eleventh Circuit has explained:

> [I]f a petitioner cannot show cause and prejudice, there remains yet another avenue for him to receive consideration on the merits of his procedurally defaulted claim. "[I]n an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." <u>Carrier</u>, 477 U.S. at 496, 106 S. Ct. at 2649. "This exception is exceedingly narrow in scope," however, and requires proof of actual innocence, not just legal innocence. <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001).

<u>Ward</u>, 592 F.3d at 1157. "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of

---

[5] <u>Murray v. Carrier</u>, 477 U.S. 478 (1986).

the underlying offense." <u>Johnson v. Alabama</u>, 256 F.3d 1156, 1171 (11th Cir. 2001) (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." <u>Calderon v. Thompson</u>, 523 U.S. 538, 559 (1998) (quoting <u>Schlup</u>, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are ultimately summarily rejected. <u>Schlup</u>, 513 U.S. at 324.

**C. Ineffective Assistance of Trial and Appellate Counsel**

"The Sixth Amendment guarantees criminal defendants effective assistance of counsel. That right is denied when a defense counsel's performance falls below an objective standard of reasonableness and thereby prejudices the defense." <u>Yarborough v. Gentry</u>, 540 U.S. 1, 5 (2003) (per curiam) (citing <u>Wiggins v. Smith</u>, 539 U.S. 510, 521 (2003); <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984)). To establish ineffective assistance, a person must show: (1) counsel's performance was outside the wide range of reasonable, professional assistance; and (2) counsel's deficient performance prejudiced the challenger in that there is a reasonable probability that the outcome of the proceeding would have been different absent counsel's deficient performance. <u>Strickland</u>, 466 U.S. at 687.

This two-part <u>Strickland</u> standard also governs a claim of ineffective assistance of appellate counsel. <u>Overstreet v. Warden</u>, 811 F.3d 1283, 1287 (11th Cir. 2016). When considering deficient performance by appellate counsel,

> a court must presume counsel's performance was "within the wide range of reasonable professional assistance." <u>Id.</u> at 689, 104 S. Ct. 2052. Appellate counsel has no duty to raise every non-frivolous issue and may reasonably weed out weaker (albeit meritorious) arguments. <u>See</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264 (11th Cir. 2009). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." <u>Smith v. Robbins</u>, 528 U.S. 259, 288 (2000) (quoting <u>Gray v. Greer</u>, 800 F.2d 644, 646 (7th Cir.1986)); <u>see also</u> <u>Burger v. Kemp</u>, 483 U.S. 776, 784 (1987) (finding no ineffective assistance of counsel when the failure to raise a particular issue had "a sound strategic basis").

<u>Id.</u>; <u>see also</u> <u>Owen v. Sec'y, Dep't of Corr.</u>, 568 F.3d 894, 915 (11th Cir. 2009) ("failing to raise or adequately pursue [meritless issues on appeal] cannot constitute ineffective assistance of counsel").

To satisfy the prejudice prong of an ineffective assistance of appellate counsel claim, a petitioner must show a reasonable probability that "but for the deficient performance, the outcome of the appeal would have been different." <u>Black v. United States</u>, 373 F.3d 1140, 1142 (11th Cir. 2004); <u>see also</u> <u>Philmore v. McNeil</u>, 575 F.3d 1251, 1264-65 (11th Cir. 2009) (prejudice results only if "the neglected claim would have a reasonable probability of success on appeal"). Also,

> [a] reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Id.</u>, at 694, 104 S. Ct. 2052.  It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." <u>Id.</u>, at 693, 104 S. Ct. 2052. Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>, at 687, 104 S. Ct. 2052.

<u>Richter</u>, 562 U.S. at 104. As such, "[a]ppellate counsel might fail to identify a mediocre or obscure basis for reversal without being ineffective under <u>Strickland</u>." <u>Overstreet</u>, 811 F.3d at 1287 (citation omitted).

For both claims of ineffective assistance of trial counsel and appellate counsel, there is no "iron-clad rule requiring a court to tackle one prong of the <u>Strickland</u> test before the other."  <u>Ward v. Hall</u>, 592 F.3d 1144, 1163 (11th Cir. 2010). Since both prongs of the two-part <u>Strickland</u> test must be satisfied to show a Sixth Amendment violation, "a court need not address the performance prong if the petitioner cannot meet the prejudice prong, and vice-versa." <u>Id.</u> (citing <u>Holladay v. Haley</u>, 209 F.3d 1243, 1248 (11th Cir. 2000)). As stated in <u>Strickland</u>: "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." 466 U.S. at 697.

Further, "[t]he question is not whether a federal court believes the state court's determination under the <u>Strickland</u> standard was incorrect but whether that determination was unreasonable - a substantially higher threshold."

10

Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quotation marks omitted). If there is "any reasonable argument that counsel satisfied Strickland's deferential standard," then a federal court may not disturb a state-court decision denying the claim. Richter, 562 U.S. at 105. As such, "[s]urmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 559 U.S. 356, 371 (2010). "Reviewing courts apply a 'strong presumption' that counsel's representation was 'within the wide range of reasonable professional assistance.'" Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1262 (11th Cir. 2016) (quoting Strickland, 466 U.S. at 689). "When this presumption is combined with § 2254(d), the result is double deference to the state court ruling on counsel's performance." Id. (citing Richter, 562 U.S. at 105); see also Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333-35 (11th Cir. 2013) (en banc) (Jordan, J., concurring); Rutherford v. Crosby, 385 F.3d 1300, 1309 (11th Cir. 2004).

## III.  **Procedural History**

This case involves two lengthy and complex state cases stemming from a four-year investigation into a statewide drug organization. In April 2005, in No. 16-2005-CF-4840-BXXX, the state arrested and charged Petitioner and several other individuals with crimes related to the organized drug enterprise.[6] In

---

[6] The Court takes judicial notice of Petitioner's state court dockets. See Mangiafico v. Blumenthal, 471 F.3d 391, 398 (2d Cir. 2006) ("[D]ocket sheets are public records of which the court could take judicial notice.").

March 2008, the state filed its fourth amended information charging Petitioner, Damontrio Glee, and eighteen other individuals with thirty-four counts including violation of racketeering laws, conspiracy to traffic in controlled substances, and conspiracy to purchase or possess cocaine with intent to sell. Resp. Ex. B at 121-26. In July 2005, in No. 16-2005-CF-5567-AXXX, the state filed an indictment charging Petitioner and Glee with two counts of first degree murder for the deaths of Larry Gibson and King Brookins, possession of a firearm by a convicted felon, and tampering with evidence. Resp. Ex. A at 24-25. Petitioner's two cases were consolidated for trial and Petitioner and Glee proceeded to a joint jury trial. Resp. Ex. C at 178. The jury trial was conducted between September 21-25, 2009.

At trial, Detective Robert Cook of the Jacksonville Sheriff's Office testified that in 2004, he was the lead detective on an investigation into an organization of individuals selling drugs, with Petitioner and Glee being the two main targets of the investigation. Resp. Ex. C at 243-44. Cook testified that Petitioner and Glee used two primary "trap houses" (structures used only for the sale of drugs) as the operating points of their drug organization – one house on "10th and Clyde" and the other house on "11th and Soutel." Id. at 245. According to Cook, JSO eventually generated enough evidence to obtain a judicially authorized wiretap intercept on Petitioner's and Glee's cell phones between December 2004 and March 2005. Id. at 246-47, 253. Cook testified that

during that time, he listened to over one thousand drug-related phone calls between Petitioner and other participants of the drug organization, including Glee, Sam Singleton, Derrick Snyder, Andrew Stephens, Darius Cooper, Silas Kendricks, and Darrell Williams. Id. at 248, 266. Relevant portions of Petitioner's recorded phone calls were played for the jury. In the recordings, Petitioner is heard speaking in code about buying and selling large amounts of cocaine. Cook, using his training and experience, explained the nuances of the terminology and coded language Petitioner used in these calls and stated the lingo was "fairly typical" when compared to other, unrelated wiretaps Cook monitored in the past. Id. at 268-333, 361. According to Cook, "under the umbrella of this drug conspiracy," JSO arrested about twenty to thirty individuals. Id. at 361. Cook testified that it was a statewide drug operation, and Petitioner and Glee were "pretty much in charge of the Jacksonville part of the organization" and supplied their "little group of people" with drugs. Id. at 361-62.

Samuel Singleton testified that he was arrested and charged with conspiracy to traffic in cocaine based on evidence obtained from a wiretap call with Petitioner. Resp. Ex. C at 515, 551. Singleton pled guilty to the charge and agreed to testify on behalf of the state in exchange for a sentencing range between zero and a five-year term of incarceration. Id. at 515-16. Singleton stated that prior to his arrest, he regularly purchased cocaine from Petitioner

and knew Petitioner to be a drug dealer who was often in possession of drugs and firearms. Id. at 520-22. According to Singleton, when Petitioner conducted drug deals at his "trap houses," Petitioner made his trades in the kitchen and had a firm rule that only Petitioner and the buyer could be present in the kitchen during the deal. Id. at 524-25.

On September 3, 2004, while JSO was conducting its investigation but before the wiretap intercept was approved, victims Larry Gibson and King Brookins went to a "trap house" located on Mattox Avenue, which was another location where Petitioner and Glee sometimes conducted business. Id. at 702. Nehemial Frederick testified at trial that he drove both Gibson and Brookins to the Mattox Avenue house that evening. Id. at 210-11. Frederick waited outside in the car as Gibson and Brookins went inside, and about fifteen minutes later they came out of the house and Frederick drove them to another location. Id. at 212. According to Frederick, within minutes, he drove Gibson and Brookins back to the Mattox Avenue house and again waited in the car while Gibson and Brookins went inside. Id. at 212-14. Frederick explained that he then heard gunshots inside the house, and when he pulled the car around to the front of the house, someone came outside and began shooting at him, so he drove away. Id. at 213-14. Frederick could not see who shot at him. Id. at 214.

Antonio Mann testified that he often bought cocaine from Petitioner and that Petitioner also goes by the nickname "Speedy." Id. at 704. Mann explained

14

that Petitioner was a known organized drug dealer. Id. Mann testified that he, Glee, Petitioner, Kenyon Lee, Marcus Small, and Andrew Stephens were inside the Mattox Avenue house when Brookins and Gibson were murdered on September 3, 2004. Id. at 709-10. According to Mann, he was playing video games when Gibson and Brookins arrived at the house. Id. at 710. Mann stated that Petitioner was in the kitchen, and Glee, Gibson, and Brookins were in the dining room. When Mann tried to walk into the dining room, Glee stopped Mann and told him to stay in the living room. Id. at 712. Mann testified he went back to playing video games and soon heard gunshots coming from the dining room. Id. at 713. According to Mann, a wall separated the living room and the dining room, and when Mann turned around to see who was shooting, he saw Glee with a gun in his hand pointing in the direction of "where [Brookins] probably was." Id. at 713-14. During those initial gunshots, Brookins was shot and killed in the dining room. According to Mann, Gibson then began to run into the living room but fell to the floor, and while he was on the floor, Glee walked over and shot him. Id. at 715. Mann stated he also saw Petitioner run into the living room with a gun in his hand. Id. Mann testified that during the incident, he only saw Petitioner and Glee with guns, but explained that he did not actually see Petitioner shoot anyone. Id. at 722, 738. After both shootings, Mann helped remove Brookins's body from the house, put Brookins in the trunk of his car, and discarded his body in a ditch a few miles away. Id. at 715-19. Mann was

later arrested for accessory to murder. Id. at 720. He explained that he agreed to testify on behalf of the state in hopes of a lesser sentence. Id.

Kenyon Lee testified that he also participated in Petitioner's drug organization. Id. at 743-44. According to Lee, he was at the Mattox Avenue house on the night that Gibson and Brookins were murdered. Id. at 744. Lee explained that after Gibson and Brookins arrived, Lee saw Brookins pull a bag of cocaine from under his shirt and then Brookins, Gibson, and Petitioner walked into the dining room. Id. at 747-48. According to Lee, Brookins and Gibson then left the house but soon returned. Id. at 749. Upon returning, Lee saw Brookins and Gibson walk into the dining room and then he heard gunshots. Id. Lee looked up and saw Gibson running into the living room, but when Gibson fell to the floor, Lee saw both Petitioner and Glee shoot Gibson. Id. Lee testified that the house had a surveillance camera set up outside that provided a live video feed to a monitor set up in the living room area. Id. at 736, 752. Lee explained that while Petitioner and Glee were shooting Gibson inside the house, he saw on the video monitor that Danny Sellers was outside the house shooting at Frederick's truck as he sped away. Id. at 736, 752. After the shooting, Lee and Andrew Stephens helped move Gibson's body into the trunk of Stephens's gold Taurus. Id. 750-54. Lee and Stephens drove Gibson to the top of a bridge, stopped the vehicle, and as they began pulling Gibson from the trunk, they spotted another car driving towards them, so they quickly dropped

16

Gibson's body on the bridge and drove away. Id. at 754. Stephens and Lee then bought a can of gasoline, drove the Taurus to a wooded area, and set the car on fire. Id. at 754-55.

Marcus Small testified that he was also at the Mattox Avenue house when Gibson and Brookins were murdered. Id. at 775-77. Small explained that he was in the living room playing video games when he witnessed Gibson and Brookins enter the house and walk into the dining room area with Glee and Petitioner. Id. at 778. According to Small, he then heard gunshots, so he turned around and saw Gibson running towards the living room and fall to the floor. Id. at 779. Small testified that he then saw Petitioner shoot Gibson. Id. Small explained that after Petitioner shot Gibson, Gibson "was wiggling," so Glee came over and shot Gibson in the head. Id. Small testified that he, Mann, Glee, and Sellers then helped put Brookins's body in the trunk of Mann's car. Id. at 780-81. Small indicated that Brookins had been shot and killed in the dining room during the initial round of gunshots, but did not state if he saw who shot Brookins.

Officer Michael Eason testified that on the night of the murders, he responded to a dispatch concerning Gibson's body being found on a bridge. Id. at 494. While at the scene, Eason learned that dispatch received another call about gunshots being fired at a house on Mattox Avenue, which was five to ten minutes away from the bridge. Id. at 494. Believing that the gunshots might relate to Gibson's murder, Eason responded to the dispatch and went to the

17

Mattox Avenue house to find a trail of blood leading up the stairs into the house. Id. at 495. Other officers arrived and because they feared that more victims were inside, they forced entry and found pools of blood, powder cocaine, marijuana, and bloody drag marks throughout the house. Id. at 497. Officers then exited and called the detective division. Id. at 496. Around that time, dispatch received another call about a vehicle fire, and believing that it could also be related, Eason coordinated the police response to the vehicle. Id.

Detective Howard Smith was the lead evidence technician at the Mattox Avenue scene. Id. at 581. He collected relevant evidence and submitted it for DNA and fingerprint testing. Id. Smith testified that he collected nine shell casings, including two .380-caliber casings on the living room floor and multiple .40-caliber casings in the dining room. Id. at 594, 597. He also noted a large bloodstain on the living room floor next to the couch and blood in the dining room. Id. He swabbed the areas for DNA. Id. at 606. According to Nicole Lee, the DNA expert, the blood found in the living room matched Gibson's DNA profile and the blood found in the dining room matched Brookins's DNA profile. Id. at 680, 81. Beakers used for cooking cocaine were also collected at the scene and fingerprints on those beakers matched Petitioner. Id. at 691-92. Prints were also retrieved from a sprite can and a shoe box, but no other evidence of value contained discernable fingerprints. Id. at 698-99.

Doctor Margarita Arruza, the medical examiner, testified that she conducted the autopsies on Brookins and Gibson. Id. at 420-25. During her examination of Gibson, she discovered five gunshot wounds and recovered two bullets from his body. Id. at 425-26, 436. She indicated Gibson had one gunshot to the head, one to the chest, one to the left armpit, one through his left ribs, and one to the left buttock. Id. at 428-35. During her examination of Brookins, Arruza discovered three gunshot wounds and recovered one bullet. Id. at 438. She stated that Brookins suffered one gunshot to his lower jaw, one to the left side of his neck, and one to his armpit. Id. at 438-42. In her medical opinion, she determined that the manner of death for both Gibson and Brookins was homicide. Id. at 443.

After collecting evidence during the wiretap intercept, on March 24, 2005, police executed search warrants for the 10th and 11th Avenue "trap houses." Id. at 459, 474. At trial, Detective Charles Bennett read the property storage card for all the items retrieved during the search of the 10th Avenue house. Resp. Ex. C at 480-81. Detective Kim Varner testified that she was the evidence custodian for the evidence obtained during the search of the 11th Avenue house and read the property storage card for all the illicit items retrieved during the search of that property. Id. at 462-63. Both property cards listed, inter alia, firearms, ammunition, cash, drug paraphernalia, digital scales, cocaine, and marijuana. Id. at 480-81, 462-63.

As his sole witness at trial, Petitioner called Michael F. Laforte, an independent forensic consultant. Resp. Ex. C at 891. During his testimony, Laforte looked at the state's crime scene photographs of the Mattox Avenue house and attempted to highlight inconsistencies in how the investigating officers used placards to number and catalog evidence while they processed the murder scene. During cross-examination, however, Laforte acknowledged that any inconsistencies in the numbering of evidence did not meaningfully affect the evidence. Id. at 922. He also explained that after reviewing the evidence, he concluded that there were two victims, one killed in the dining room and the second killed in the living room, and he determined that two shooters and two separate guns were used to shoot the victims in this case. Id. at 919.

After closing arguments, the trial court instructed the jury on these charges for No. 16-2005-CF-4840-BXXX – violation of racketeering laws (count one); conspiracy to traffic in cocaine, with Andrew Ray (count two); conspiracy to traffic in cocaine, with Damontrio Glee (count three); and conspiracy to purchase or possess cocaine with intent to sell, with Darius Lamon Cooper (count four). Resp. Ex. C at 1050. As to No. 16-2005-CF-5567-AXXX, the trial court instructed the jury on these charges – first degree murder of King Brookins (count five); first degree murder of Larry Gibson (count six); and tampering with evidence (count seven). Resp. Ex. A at 1543-77. For each first degree murder charge (counts five and six), the trial court instructed the jury

on two theories – (1) the killings occurred with premeditated design and (2) the murders occurred while Petitioner was engaged in the commission of a felony, specifically a robbery or trafficking in cocaine. Id. at 1554. Because the indictment cited § 775.087, Florida Statutes, the trial court also instructed the jury on the firearm reclassifications for the homicide charges. It instructed that if the jury found Petitioner guilty of first degree murder, it must make a finding that, during the commission of the murder, Petitioner either discharged a firearm causing great bodily harm, discharged a firearm, or possessed a firearm. The trial court also instructed the jury on the principal theory and explained Petitioner must be treated as a principal to the crime if he helped another commit the crime. Id. at 1557. Finally, the trial court instructed the jury on the lesser included crimes for counts two and three – conspiracy to sell or deliver cocaine and conspiracy to possess cocaine – and the lesser included crimes for counts five and six – second degree murder and manslaughter. The jury found Petitioner guilty of counts one through seven as charged. Resp. Ex. C at 1083-86.

In No. 16-2005-CF-4840-BXXX, the trial court adjudicated Petitioner as a Habitual Felony Offender and sentenced him to a life term of imprisonment on counts one, two, three, and four. The trial court later resentenced Petitioner

on count four to a five-year term of incarceration.[7] In No. 16-2005-CF-5567-AXXX, the trial court sentenced Petitioner to a life term of incarceration as to counts five and six, and a ten-year term of incarceration as to count seven.

Petitioner, with help from appellate counsel, sought a direct appeal of each judgment and the cases were consolidated for appeal. Resp. Exs. D, E. The First District Court of Appeal per curiam affirmed Petitioner's judgments and convictions without a written opinion. Resp. Ex. H. Petitioner then filed several pro se motions for postconviction relief with the trial court and the state appellate court, which were denied. This Petition followed.

## IV.   The Petition

### A. Grounds One, Two, Three, and Eleven

Although each of these Grounds is couched in claims of either trial court error, ineffective assistance of trial counsel, or ineffective assistance of appellate counsel, the touchstone of Petitioner's arguments in Grounds One, Two, Three, and Eleven are the same. Petitioner challenges the trial court's oral reading of the final jury instruction for the homicide charges and its misstatement when it advised the jury on § 775.087's reclassification options.

---

[7] The trial court resentenced Petitioner on count four at the direction of the First District Court of Appeal's order granting Petitioner's Florida Rule of Criminal Procedure 3.800(a) motion to correct illegal sentence, finding that section 775.084(1)(a)(3), Florida Statutes, prohibits habitualization for a felony "relating to the purchase or possession of a controlled substance," and as a third degree felony, count four was punishable by a maximum sentence of five years. See Ray v. State, 177 So. 3d 1040 (Fla. 1st DCA 2015).

At trial, after reading the instructions for premeditated first degree murder and first degree felony murder, the trial court instructed the jury on making a finding under § 775.087. The trial court stated the following on the record:

> If you find that Lavario Ray committed first-degree murder and you also find beyond a reasonable doubt that during the commission of the crime, he discharged a firearm and in doing so caused great bodily harm to or the death of King Brookins and/or Larry Gibson, you should find the defendant guilty of first-degree murder with discharge of a firearm causing great bodily harm or death.
>
> If you find Mr. Ray committed **second-degree murder** and you also find beyond a reasonable doubt during the commission of the crime he discharged a firearm, you should find the defendant guilty of **first-degree** murder with discharge of a firearm.
>
> If you find Mr. Ray committed first-degree murder and also find beyond a reasonable doubt that during the commission of the crime, he actually possessed a firearm, you should find the defendant guilty of first-degree murder with actual possession of a firearm.

Resp. Ex. C at 1061-62 (emphasis added). After instructing the jury on count seven and the principal theory, the trial court then read the instructions for the lesser included offenses. Id. at 1062-69. Petitioner now relies on the trial court's misstatement, which is in bold print above, to seek federal habeas relief.

In Ground One, Petitioner asserts that the trial court committed fundamental error when giving this oral instruction because it amounted to a

23

"constructive amendment" to the indictment. Doc. 1 at 5. In Ground Two, Petitioner argues the trial court's erroneous instruction deprived him of an accurate instruction on the lesser included offense of second degree murder. Id. at 7. In Ground Three, Petitioner contends his trial counsel was ineffective for failing to object to this erroneous instruction. Id. at 8. Finally, in Ground Eleven, Petitioner argues that his appellate counsel was ineffective for failing to argue on direct appeal that this erroneous jury instruction amounted to reversible error. Id. at 18.

Respondents argue that Petitioner failed to exhaust his trial court error claims in Grounds One and Two and his ineffective assistance of trial counsel claim in Ground Three. Resp. at 41-45, 51-57, 63. This Court agrees. Petitioner made the arguments in Grounds One, Two, and Three in his supplemental Florida Rule of Criminal Procedure 3.850 motion. Resp. Ex. X at 278-87. In its final order denying Petitioner's amended Rule 3.850 motion, the trial court struck Petitioner's supplemental Rule 3.850 motion from the record and declined to consider any arguments raised in it. Id. at 351-53.[8] Petitioner

---

[8] The trial court struck Petitioner's supplemental Rule 3.850 motion and declined to consider the claims raised in it because Petitioner filed the supplement after being permitted to file an amended Rule 3.850 motion and after the trial court directed the state to file a response to the amended Rule 3.850 motion. Resp. Ex. X at 350-52.

appealed the trial court's order, and the First DCA per curiam affirmed the trial court's decision to strike these claims. Resp. Ex. Z.

Respondents concede, however, and this Court notes, that in Petitioner's first petition alleging ineffective assistance of appellate counsel under Florida Rule of Appellate Procedure 9.141, Petitioner raised a claim that appellate counsel was ineffective for failing to argue on direct appeal that this erroneous verbal instruction amounted to fundamental error. Resp. Ex. J at 4-9. The First DCA directed the state to respond to the claim. Resp. Ex. K. In response, the state argued:

> [E]ven assuming arguendo the trial court inadvertently misstated the instruction as to the use of a firearm in connection with First Degree Felony Murder, Petitioner has still failed to establish he was prejudiced as a result of appellate counsel's failure to raise the issue on direct appeal.
>
> Although Petitioner's claim of prejudice is predicated on his assertion that but for the instruction as read, the jury "might have found the petitioner guilty of second-degree murder with discharge of a firearm," the State disagrees. Initially, the State notes that the cited instruction dealt solely with the jury's determination as to whether a firearm was discharged in the commission of the felony murder. The instruction, however, did not pertain to the requisite finding of whether Petitioner committed First Degree Premeditated Murder, First Degree Felony Murder, Second Degree Murder, or even Manslaughter. Thus, there was no possibility that the jury could have been misled into finding Petitioner guilty for a greater offense, considering the fact that the portion of the instruction at issue did not pertain to such a

determination but, instead, dealt with the use, or non-use, of a firearm in the commission of the offense.

Further, Petitioner's belief that the jury "might" have found him guilty of Second Degree Murder, is refuted by the jury[] finding Petitioner guilty of First Degree Premeditated Murder. Therefore, logically, there was no possibility that the jury believed that Petitioner only committed a Second Degree Murder with Discharge of a Firearm, since the jury specifically rejected such a notion in finding that Petitioner acted with a premeditated design to effectuate the deaths of both victims, and that he specifically used a firearm in the commission of such acts. There is an inherent illogic to Petitioner's belief that the jury "might" have found him guilty of Second Degree Murder with Discharge of a Firearm, solely on the basis that the oral recitation of a small portion of the Felony Murder instruction relating to the use of a firearm was read to the jury. The jury specifically rejected that the murders occurred in a manner sufficient for a finding of Second Degree Murder, as well as rejected a finding that the murders occurred without premeditation during a felonious episode. Thus, any confusion that may have arisen from the oral instruction relating to the small part of the Felony Murder instruction cited was negligible. In other words, any error was not fundamental, given the specific finding by the jury that Petitioner acted with a premeditated design to kill the victims, and that he used a firearm in the commission thereof.

Additionally, the written instructions provided to the jury accurately reflect the requisite findings to be made by the jury. Moreover, . . . any error emanating from appellate counsel's failure to raise this claim did not result in prejudice to Petitioner's case given the ample evidence presented at trial demonstrating that Petitioner, and his co-defendant, committed the subject murders out of a premeditated design to do so. Thus, appellate counsel would have had no basis upon which

> to argue that fundamental error occurred with respect
> to this claim of alleged error.

Resp. Ex. L at 9-12. The state then summarized the evidence presented trial. Id. at 21-29. The First DCA per curiam denied the petition, with a single citation to State v. Delva, 575 So. 2d 643 (Fla. 1991) ("Instructions . . . are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred."). Resp. Ex. N.

To the extent that Petitioner challenges the trial court's oral misstatement of this instruction in terms of trial court error or ineffective assistance of trial counsel, Petitioner did not properly present those versions of this challenge to the state court and thus those claims are unexhausted and procedurally defaulted. That said, when Petitioner properly and timely couched this claim in terms on ineffective assistance of appellate counsel and the First DCA considered it on the merits, he exhausted the essence of this issue. Thus, the Court addresses Petitioner's ineffective assistance of appellate counsel argument in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d).

As to any substantive challenge to the instruction error and Petitioner's claim of ineffective assistance of trial counsel, the Court addresses those arguments on the merits.[9] In doing so, the Court agrees that the trial court misspoke when verbally instructing the jury on finding whether Petitioner discharged or possessed a firearm during the commission of the first degree murders. But the Court heeds the First DCA's conclusion in Petitioner's Rule 9.141 proceedings that the trial court's misstatement did not affect the outcome of Petitioner's trial; and thus Petitioner cannot demonstrate prejudice under Strickland. As to any substantive challenge, Petitioner cannot show that the trial court's error in reading the instruction so infected the entire trial that his resulting conviction violated due process. Henderson v. Kibbe, 431 U.S. 145, 154, (1977) (quotation omitted). The Court does not judge the allegedly erroneous instruction "in artificial isolation," but considers the instruction in the context of the trial record and the jury instructions as a whole. Id. at 152 n.10 (citing Boyd v. United States, 271 U.S. 104, 107 (1926)); Agan v. Vaughn, 119 F.3d 1538, 1545 (11th Cir.1997) ("A defendant's right to due process is not

---

[9] Although the state court declined to consider Petitioner's supplemental Rule 3.850 motion and any claim raised in it is now unexhausted and procedurally defaulted, the Court is not prohibited from doing an alternative merits analysis on those claims because the state court did not "clearly and expressly" rely on state procedural rules when disposing of the supplemental Rule 3.850 motion.

violated unless an erroneous instruction, when viewed in light of the entire trial, was so misleading as to make the trial unfair.")

Indeed, the record shows that despite this single verbal misstep, the trial court provided the jury with the written instructions, which were properly worded and complete. Resp. Ex. A at 1543-77. Thus, if the trial court's oral instruction confused the jury, it had available the full and complete written instructions and verdict forms to clarify any misunderstanding during its deliberations. Also, and likely of more import, the trial court did not misspeak during its instruction on the elements of any lesser included offense but uttered the misstatement during the special reclassification instruction on the use or possession of a firearm during the commission of the charged first degree murders – a finding applicable only after the jury determined that the elements of first degree murder were proven beyond a reasonable doubt. Considering the complete written instructions and under these circumstances, the Court cannot find that the misstated oral instruction was so prejudicial or so infected the entire trial that Petitioner's resulting convictions amounted to a due process violation. Grounds One, Two, Three, and Eleven are due to be denied.

## B. Ground Four

Petitioner argues that the wiretap application and order approving the "intercept wire communications was obtained by means of fraud, deceit, mistake," and contrary to § 934.09, Florida Statutes. Doc. 1 at 10. As such, he

29

asserts any evidence obtained through the wiretap should have been suppressed and the trial court's failure to grant his pretrial motion to suppress the evidence violated his rights under the Fourth Amendment. Doc. 1 at 10; Doc. 55 at 37.

Respondents contend this claim is unexhausted because while Petitioner raised the claim in his supplemental Rule 3.850 motion, the trial court struck that supplement and declined to address this claim on the merits, and the First DCA per curiam affirmed the trial court's ruling. Resp. at 64-65 (citing Resp. Ex. X at 288-98, 350-52). In his Reply, Petitioner appears to acknowledge that the state courts never addressed his supplemental Rule 3.850 motion on the merits, but he argues he later exhausted this claim because after the trial court resentenced him in No. 16-2005-CF-4840-BXXX, he filed another postconviction motion raising this claim and the state court addressed the claim on the merits. Doc. 55 at 42.

Days before trial, Petitioner, with help from trial counsel, moved to suppress the wiretap evidence. See Nos. 16-2005-CF-5567-AXXX; 16-2005-CF-4840-BXXX. In the motion, Petitioner sought to suppress the evidence because he believed it was obtained through a materially false and misleading wiretap application in violation of Franks v. Delaware, 438 U.S. 154 (1978), as well as the Fourth and Fourteenth Amendments. Id. He argued the application for the wiretap failed to provide a detailed statement of facts about the alleged offenses,

30

as required by § 934.09, and failed to demonstrate the requisite probable cause. Petitioner argued the application contained only form language, failed to describe how other investigatory techniques were insufficient, and contained vague and conclusory information from unreliable confidential informants who did not adequately describe the communication law enforcement sought to obtain with the wiretap. Id. The trial court held a hearing on the motion, during which it heard argument from trial counsel and the state. Resp. Ex. B at 874-87. During the hearing, trial counsel argued the same facts alleged in her motion, asserting again that the application was insufficient because it contained only form language and the affiant's assertion that the wiretap was necessary to obtain evidence against Petitioner because Petitioner, who was a top tier dealer in the investigation, would never engage in a controlled buy, was insufficient. Id. at 878. She also asserted that the application contained misstated facts to support the wiretap request and that the court that granted the request was misled. Id.

In response, the state argued that the motion should be denied because to the extent that the application contained some form language, that language has been held to be sufficient and is contained in all wiretap applications. Id. at 881. It also argued that a new wiretap application was presented and approved every thirty days, and each application stated, as required, that it was believed the wiretap would expose "discussions relating to the trafficking of cocaine,

agreements to further these intentions, the manner deemed to obtain, transporting, storing, distributing the cocaine, identity of other participants, nature and scope of the activity, the transportation and use of the monetary proceeds derived from the sale and distribution of cocaine." Id. at 882. The state explained that the applications described information obtained from various confidential informants, described each informant, and contained information on what that informant knew. Id. at 883. The state argued that even if the information supporting the wiretap was obtained through confidential informants, that fact does not detract from the reliability of the source nor does it mean that the court was misled when reviewing the application. Id. at 886. The state reasoned that a state court circuit judge reviewed each application and found that the information was sufficient to approve the wiretap and continue that wiretap until Petitioner's arrest. Id. at 885. Finally, the state argued that if Petitioner challenged the credibility of Detective Cook as the affiant, the state explained that Cook was available to testify about the truthfulness of his statements. Id.

After hearing the parties' arguments, the trial court advised that it would take the motion under advisement. Id. at 887. On the morning of jury selection, the trial court rendered a one-line order summarily denying the motion to suppress. See Nos. 16-2005-CF-5567-AXXX; 16-2005-CF-4840-BXXX. In its order of denial, the trial court did not make any findings of fact supporting its

decision, and while it may have explained its ruling on the record before jury selection, any such oral ruling was not transcribed and is not present in the record before the Court nor does it appear on the docket for either of Petitioner's state court cases.[10]

Following Petitioner's direct appeal, Petitioner raised a claim in his supplemental Rule 3.850 motion that the trial court erred in denying his motion to suppress. Resp. Ex. X at 288-308. The trial court struck the supplemental Rule 3.850 motion and declined to consider the claim. Id. at 352. The First DCA per curiam affirmed the trial court's order without a written opinion. Resp. Ex. Z.

But, as Petitioner explains, following his resentencing in No. 16-2005-CF-4840-BXXX, Petitioner, with help from counsel, filed a "Motion to Take Judicial Notice" asking the trial court to reconsider its prior order authorizing "wire intercepts as it was procured by means of fraud, deceit, and mistake." See No. 16-2005-CF-4840-BXXX. In support of the motion, Petitioner attached a copy of

---

[10] Typically, "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Stone v. Powell, 428 U.S. 465 (1976). But when there is no record of the trial court's essential findings of fact supporting its denial of a motion to suppress, a petitioner's Fourth Amendment claim is not precluded from habeas review under Stone. Tukes v. Dugger, 911 F.2d 508, 513-14 (11th Cir. 1990) (holding that a summary denial of a motion to suppress, "coupled with a summary affirmance by the Florida appellate court" is insufficient to bar a federal court's review of a Fourth Amendment claim).

the state attorney's August 2004 application for the wire intercept and Detective Cook's fifty-eight-page affidavit containing facts showing that officers had the necessary probable cause for the wire intercept. Id. The trial court denied that motion, finding as follows:

> A court must take judicial notice of matters enumerated in section 90.201, Florida Statutes (2018), and may take judicial notice of matters enumerated in section 90.202, Florida Statutes (2018). Petitioner's request, that this Court reopen and review an order authorizing wire intercepts, falls within neither statute. Thus, judicial notice is inappropriate. However, because a court must not elevate form over substance, Houghtaling v. State, 670 So. 2d 1019, 1019 (Fla. 2d DCA 1996), this Court will address Defendant's claim on the merits.

> Defendant challenges an affidavit for a wiretap based upon fraud. See Franks v. Delaware, 438 U.S. 154 (1978). "Franks permits defendants to attack a warrant where police intentionally lie or misstate information material to the probable cause determination in the affidavit supporting the warrant in order to deceive the judge into issuing the warrant." State v. Petroni, 123 So. 3d 62, 65 (Fla. 1st DCA 2013). When an affidavit is challenged pursuant to Franks, a court should not scour an affidavit for technical mistakes, but should focus its inquiry on the affiant's intent to deceive. United States v. Miller, 24 F.3d 1357, 1361 (11th Cir. 1994) (citations omitted). Because none of [Defendant's] allegations involve deception, but are mere discrepancies, inconstancies, or non-material omissions, he is not entitled to relief. Id.

> Further, Defendant's claim is not timely because the instant Motion was filed more than two years after his convictions became final. [FN1] See Perkins v. State, 845 So. 2d 273, 274 (Fla. 2d DCA 2003) ("Motions

under rule 3.850 must be filed within two years 'after the judgment and sentence become final in a noncapital case.'["] (citing Fla. R. Crim. P. 3.850(b))). None of Defendant's allegations involve matters that were not known to him or could not have been discovered through due diligence during his two-year window to file a claim pursuant to Rule 3.850. <u>See</u> <u>Lamb v. State</u>, 212 So. 3d 1108, 1111-12 (Fla. 5th DCA 2017). Absent newly discovered evidence of police misconduct, there is no procedural vehicle by which Petitioner can now challenge the warrant.

[FN 1] This Court did re-sentence Defendant based upon an illegal sentence, but that did not reset his ability to file a motion for post-conviction relief attacking his underlying <u>convictions</u>.

<u>See</u> No. 16-2005-CF-4840-BXXX. Petitioner appealed the trial court's denial, and in July 2019, the First DCA per curiam affirmed the denial without a written opinion. <u>See</u> <u>Ray v. State</u>, 277 So. 3d 551 (Fla. 1st DCA 2019).

To the extent that <u>Stone</u> does not preclude the Court's habeas review of this issue, the First DCA's July 2019 adjudication of this claim is entitled to deference. And "federal courts must defer to state law on the question of the validity of wiretap orders obtained by state law enforcement officers in state courts." <u>United States v. Glinton</u>, 154 F.3d 1245, 1252-53 (11th Cir. 1998). Because the wiretap application was made by the state and approved by a Florida circuit court judge, Florida state law governs the admissibility of the

wiretap evidence here. See United States v. Johnson, 281 F. App'x 909, 912 (11th Cir. 2008).[11]

Petitioner argues that Cook's December 2004 affidavit failed to comply with §§ 934.09(1)(c) and (e). Section 934.09(1)(c) provides that an application for an order authorizing a wire intercept must contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." § 934.09(1)(c), Fla. Stat. According to § 934.09(1)(e), the affidavit must also include "[a] full and complete statement of the facts concerning all previous applications known to the individual authorizing and making the application, made to any judge for authorization to intercept, or for approval for interceptions of, wire, oral, or electronic communications involving any of the same persons, facilities, or places specified in the application, and the action taken by the judge on each such application." § 934.09(1)(e), Fla. Stat.

In his fifty-eight-page affidavit supporting the request for the December 2004 wiretap, Detective Cook provided extensive detail about the investigation into the trafficking and conspiracy offenses. Resp. Ex. A at 263-322. He stated

---

[11] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

that "all of the named Subject Individuals ha[d] been checked and were found not to have been the target or subject in any previously court-authorized interceptions, other than already specified in the application." Id. at 319. Although Cook mentioned that co-defendant Glee was "chargeable with conspiracy to traffic in cocaine" based on information obtained from "an earlier wire," that statement alone does not contradict Cook's statement that Glee, as a "Subject Individual" was never the "target or subject" of a prior wire. Id. at 318-19. Cook also listed the various investigative techniques that officers attempted and performed before resorting to the wiretap request, including physical surveillance, grand jury subpoenas, confidential sources, undercover agents, interviews, searches of premises, and pen registers or caller identification information, and explained why those prior techniques failed or where too dangerous to continue. Id. at 309-20. The affidavit also specified the type of communication it sought to intercept and gave a statement of the offenses to which it related. Id. Thus, Cook's affidavit satisfied the statutory requirements of § 934.09 and Petitioner's challenges here cannot overcome the state court's findings. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of clearly established federal law and it was not based on an unreasonable determination of the facts

given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Four is denied.

**D. Ground Five**

Petitioner argues that the trial court erred when it denied trial counsel's request for a <u>Richardson</u>[12] hearing. Doc. 1 at 13. At trial, Detective Cook testified that following Petitioner's arrest, he questioned Petitioner about the recorded phone calls, and Petitioner explained to Cook that he was not in the business of selling drugs but was instead "selling hats." Resp. Ex. C at 366. Petitioner's trial counsel objected to the statement, arguing that Petitioner's statement about selling hats "was made only in his [pretrial] proffer, which cannot be used against him." <u>Id.</u> at 369-70. In response, the state explained that Petitioner made the statement about selling hats during a proffer with the prosecutor but also made the statement "post-arrest, pre-proffer" and explained that the statement was in a police report. <u>Id.</u> at 370-73. Trial counsel argued that she did not receive any police reports containing Petitioner's alleged statement and that the state was erroneously presenting evidence of statements Petitioner made during his proffer for which he had "immunity." <u>Id.</u> at 374.

The trial court then directed the state to question Detective Cook, on the record and outside the presence of the jury, to determine whether Petitioner

---

[12] <u>Richardson v. State</u>, 246 So. 2d 771 (Fla. 1971).

made the statement at some time other than his pretrial proffer and if so, whether he had waived his <u>Miranda</u>[13] rights at the time of the statement. <u>Id.</u> at 374-79. Detective Cook then testified that on the day of Petitioner's arrest and following Petitioner's waiver of his <u>Miranda</u> rights, Petitioner advised Cook that the purpose of one of the phone calls was to sell hats. <u>Id.</u> at 378-79. Trial counsel then asked whether Cook put that statement in a police report, and Cook responded that he did not recall. <u>Id.</u> at 379. After hearing Cook's explanation, the trial court overruled trial counsel's objection that the statement only came from an inadmissible proffer, and trial counsel then requested a <u>Richardson</u> hearing because she was never provided with a copy of a police report that contained the statement at issue. <u>Id.</u> at 380. The trial court denied trial counsel's request and advised that trial counsel was welcome to cross examine Cook about why he failed to put that statement in any police report and explained "that would go to the weight of his testimony." <u>Id.</u> at 381. During cross-examination, Cook testified he interviewed Petitioner right after his arrest and admitted there should have been a report containing details about the statements Petitioner made during that interview. <u>Id.</u> at 387-88

Petitioner now argues that the trial court erred in denying trial counsel's request for a <u>Richardson</u> hearing. Doc. 1 at 13. Respondents argue that this

---

[13] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

claim is unexhausted and procedurally barred because Petitioner raised it in his supplemental Rule 3.850 motion, which the state court struck and declined to consider. Resp. at 70-72. The Court agrees, and finds this claim is unexhausted and procedurally barred.

In any event, even if this claim were properly exhausted, Petitioner is not entitled to relief. "A <u>Richardson</u> hearing is held to determine whether the State committed a discovery violation in contravention of the Florida Rules of Criminal Procedure and, if so, whether the non-compliance resulted in prejudice to the defendant's ability to prepare for trial." <u>Cisneros v. McNeil</u>, No. 8:05-cv-762-T-27TGW, 2008 WL 1836368, at *5 (M.D. Fla. Apr. 23, 2008). A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief because no federal constitutional question is presented. 28 U.S.C. § 2254(a); <u>Estelle v. McGuire</u>, 502 U.S. 62, 67 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Thus, whether the trial court failed to conduct a <u>Richardson</u> hearing is a matter of state law and is not cognizable on federal habeas corpus review. That said, given the substantial evidence of Petitioner's guilt, Petitioner cannot demonstrate the outcome of his trial would have been different had Detective Cook not testified about Petitioner's statement that his phone calls were about "selling hats." Ground Five is denied.

**E. Ground Six**

Petitioner argues that the trial court erred in instructing the jury on the uncharged offenses of robbery and trafficking when instructing on first degree murder. Doc. 1 at 13. Respondents argue that this claim is unexhausted and procedurally barred because Petitioner raised this issue in his supplemental Rule 3.850 motion, which the state court declined to consider. Resp. at 73-75. The Court agrees that this claim is unexhausted and procedurally barred, and in his Reply, Petitioner does not appear to specifically address Respondents' exhaustion argument for this claim. See generally Doc. 55.

In any event, even if this claim were exhausted, it lacks merit. In the charging document for No. 16-2005-CF-5567-AXXX, the state alleged Petitioner killed Brookins and Gibson with "premeditated design" and cited to § 782.04(1)(a), Florida Statutes. Resp. Ex. A at 24. Section 782.04(1)(a) defines first degree murder as the unlawful killing of a human being when either perpetrated from a premeditated design or when committed by a person engaged in the perpetration of a felony, such as a trafficking offense or robbery. See § 782.04(1)(a)1, 2a, 2d, Fla. Stat. Contrary to Petitioner's contention, when an indictment charges premeditated murder, Florida law permits instructing the jury on both premeditated murder and felony murder. See Anderson v. State, 841 So. 2d 390, 404 (Fla. 2003) (rejecting defendant's argument that the trial court erred in permitting the state to proceed on a theory of felony murder

41

when the indictment charged only first degree murder); <u>Kearse v. State</u>, 662 So. 2d 677, 682 (Fla. 1995) ("The State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder.") (citations omitted). The Eleventh Circuit has recognized this aspect of Florida law:

> At the time of Petitioner's trial, Florida law permitted (and still does) the state to prosecute under premeditated or felony murder theories when the indictment charged premeditated murder . . . . The state prosecuted primarily under a premeditated design theory even though evidence showing felony murder was introduced at trial. The trial court simply refused to limit the state to one theory of prosecution where state law permitted the prosecution to proceed under a dual theory. If there was error by the trial court, this Court is convinced that such error was not of a constitutional dimension. The benefit to the state from the error (if any was committed) did not contribute to Petitioner's conviction since there was ample evidence upon which to base a conviction under either theory.

<u>Knight v. Dugger</u>, 863 F.2d 705, 725 (11th Cir. 1988). Likewise, here, there was ample evidence that Petitioner could have been convicted of first degree murder under either theory, and the trial court did not err in instructing the jury that Petitioner could be guilty of first degree murder if the killing was committed while Petitioner was engaged in the commission of trafficking or robbery. Thus, Ground Six is denied.

**F. Ground Seven**

Petitioner argues that his trial counsel was ineffective for failing to depose and call a potential witness to testify at trial and for failing to prepare and present a proper and adequate defense. Doc. 1 at 15. Petitioner raised this claim in his amended Rule 3.850 motion. Resp. Ex. X at 165-66; Doc. 1 at 15. The trial court denied this claim on the merits, finding as follows:

> Next, Defendant claims that, but for counsel's failure to call Quitta Brown as a witness, there is a reasonable probability that the outcome of the trial might have been different. Defendant contends that Ms. Brown would testify that co-defendant Andrew Stephens confessed that "he committed the murders because some guys tried to robb [sic] him." Defendant avers that Ms. Brown gave this statement during a deposition. Defendant alleges that this testimony would create reasonable doubt because it would shed light on Antonio Mann's testimony that (1) Andrew Stephens owned a handgun of the same caliber as that used in the shootings, (2) Andrew Stephens was present when the murders occurred, and (3) that he saw Andrew Stephens pick up a gun from the ground and place it in his car's trunk.

> The Florida Supreme Court set forth a four-part test that a defendant must meet when asserting a claim of ineffective assistance of counsel for failing to call, interview, or investigate a witness. Nelson v. State, 875 So. 2d 579 (Fla. 2004). A defendant must allege (1) the identity of the prospective witness; (2) the substance of the witness's testimony; (3) an explanation of how the omission of this evidence prejudiced the outcome of trial; and (4) an assertion that the witness was available to testify. Id. A defendant must also allege that he advised counsel of the existence of such a witness. Prieto v. State, 708 So. 2d 647, 649 (Fla. 2d

DCA 1998). Defendant's claim is facially insufficient because he fails to assert that [] Quitta Brown was available to testify and that he advised counsel of the existence of Ms. Brown. However, this Court need not grant Defendant leave to amend his insufficient claim under <u>Spera v. State</u>, 971 So. 2d 754 (Fla. 2007) because, as this Court will show, Defendant cannot demonstrate a good-faith basis for amending his claim.

At trial, several witnesses testified against Defendant. Antonio Mann, a/k/a "T.O.," testified that [he] was in the drug house with Defendant, a/k/a "Speedy," and Damontrio Glee, a/k/a "Tank," Keon Lee, a/k/a "Keyon," Marcus Small, a/k/a "Sleet," and Andrew Stephens, a/k/a "Drew," while victim Larry Gibson and another man were there. Mr. Mann testified that he was in the front living room with Mr. Stephens, Mr. Small, and Mr. Lee. Mr. Mann testified that he heard gunshots coming from the dining room and saw victim Larry Gibson run into the living room and fall to the ground. Mr. Mann said he saw Mr. Glee shoot the victim in his side and then in the head. Mr. Mann also testified that he saw Defendant come out of the kitchen with a gun in his hand, although he did not see him shoot either victim. He further stated that Defendant and Mr. Glee were the only people at the crime scene with guns. He also testified that Mr. Stephens owned a .380 caliber handgun and that he never saw him with a gun that night except when he picked up a gun from the ground after the shooting and placed it in the trunk of a car.

Kenyon Lee, a/k/a "Keon," testified that he was in the front room of a drug house along with Mr. Small, Mr. Stephens, and Mr. Mann while Defendant and Mr. Glee were in the back dining room along with two other men when gunfire broke out. Mr. Lee testified that he saw both Defendant and Mr. Glee shoot and kick one of the victims while he was on the ground.

44

Marcus Small, a/k/a "Sleet," testified that he was in the living room of a dope house along with Mr. Mann, Mr. Lee, and Mr. Stephens while Defendant, Mr. Glee, Mr. Gibson and another man were in the dining room when gunfire broke out. Mr. Small testified that he saw both Defendant and Mr. Glee shoot Mr. Gibson. He specifically stated that Mr. Stephens did not do the shooting and that he only saw Defendant and Mr. Glee with guns.

Had counsel called Quitta Brown to testify that Andrew Stephens confessed to her that he committed the murders, that testimony would have contradicted the testimony of Mr. Mann, Mr. Lee, and Mr. Small, all of which were present at the crime scene when the murders occurred. It is unreasonable that a jury would have assigned more weight to Ms. Brown's statement than to the corroborative testimony of these three witnesses. Defendant has failed to show prejudice under Strickland. Accordingly, Defendant's second ground for relief is denied.

Resp. Ex. X at 353-56 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. Z.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Seven is denied.

## G. Ground Eight

Petitioner argues that his trial counsel was ineffective for failing to move to suppress state witness Small's trial testimony. Doc. 1 at 15. Petitioner raised this claim in his amended Rule 3.850 motion. Resp. Ex. X at 166-67. The trial court denied the claim on the merits, finding the following:

> In ground three, Defendant claims that, but for counsel's failure to file a motion to suppress Marcus Small's testimony, there is a reasonable probability that the result of the trial would have been different. Defendant claims that suppression was warranted because Mr. Small testified during a deposition that he received immunity for his trial testimony, which included Mr. Small's identification of Defendant as one of the shooters. Defendant implies that, had counsel moved for a motion to suppress, it would have been granted, leaving his identification as a shooter to only two witnesses: Mr. Mann and Mr. Lee. Defendant claims their testimony is contradictory in two ways. First, Defendant avers that Mr. Mann testified Defendant did not shoot either victim and that Mr. Lee testified that he saw both Defendant and Mr. Glee shoot one of the victims. Second, Defendant alleges that Mr. Mann testified that Mr. Lee was asleep until the point of the shooting and that Mr. Lee testified that he was awake prior to the shooting. Defendant alleges that this contradictory testimony would have created enough of a doubt to reasonably change the outcome of the trial.

> Assuming arguendo that counsel was ineffective, which this Court does not find, Defendant's claim must nonetheless fail because he cannot show prejudice. Had Mr. Small's testimony been suppressed, the jury would have been left to consider the testimonies of Mr. Mann and Mr. Lee. Defendant's allegation that the testimonies contradict is based on his misstatement of

Mr. Mann's testimony. As outlined in this Court's analysis of Ground Two, Mr. Mann testified that he did not see Defendant shoot either victim. This is inherently different from Defendant's allegation that Mr. Mann testified that Defendant did not shoot either victim. Mr. Mann also testified that he was in the living room when he heard gunshots from the dining room, that he saw Defendant come out of the kitchen with a gun in his hand, and that Defendant and Mr. Glee were the only people at the crime scene with guns. This testimony is therefore consistent with that of Mr. Lee, who testified that he saw both Defendant and Mr. Glee shoot and kick one of the victims while he was on the ground. Thus, without Mr. Small's testimony, the jury would have considered the corroborating and inculpatory testimonies of two eyewitnesses. Had Mr. Small's testimony been suppressed, it is unreasonable that the jury would have acquitted him.

Second, although Mr. Mann's testimony (that Mr. Lee was "sitting up, dozed off" on the couch just prior to the shootings, and the noise prompted him to get up) contradicted Mr. Lee's testimony (that he was smoking "weed" and playing video games prior to the shooting), this contradiction would not have reasonably changed the outcome of the trial. Mr. Small testified that several of the witnesses were taking turns playing the video game in a tournament, in which the winner plays the next opponent. Mr. Mann testified that he was sitting down playing a video game just prior to the shooting. It is quite reasonable that Mr. Mann's attention was focused on playing the video game and not on whether Mr. Lee had dozed off. In any event, Mr. Mann testified that the gunshots woke Mr. Lee. Had Mr. Lee been sleeping, and had the gunshots woke him, it is reasonable Mr. Lee woke from the initial gunshots, stemming from the dining room, and that he was then awake to witness the second round of gunshots that took place in front of him in the living room. Moreover, both the State and defense counsel addressed the slight contradictions among witness' testimony during closing

> arguments. This Court finds it is unreasonable that this conflicting testimony would have resulted in a different outcome at trial. Thus, Defendant has failed to show prejudice. Accordingly, Defendant's third ground for relief is denied.

Resp. Ex. X at 356-58 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. Z.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Eight is denied.

## H. Ground Nine

Petitioner asserts that his trial counsel was ineffective for failing to object to the state's <u>Giglio</u>[14] violation. Doc. 1 at 16. In support of this claim, Petitioner cites to claims he raised in his amended Rule 3.850 motion, in which he alleged that during Small's trial testimony, Small lied and testified that he did not receive any deal from the state in exchange for his testimony, and trial counsel

---

[14] <u>Giglio v. United States</u>, 405 U.S. 150 (1972).

was ineffective for failing to challenge this testimony. Id.; Resp. Ex. X at 167.

The trial court denied those claims as follows:

> In ground four, Defendant claims that counsel was ineffective for failing to impeach State witness Marcus Small for falsely testifying that he received no consideration for his testimony. Defendant cites to "the record at pages 43-44" for support of his allegation that Mr. Small testified to the contrary in a deposition. Defendant contends that, but for counsel's failure to impeach Mr. Small, the result of the trial may have been different.

> Initially, this Court notes that Defendant fails to attach "the record at pages 43-44" in his Motion. Nor has this Court found a deposition at pages 43-44 in the Record on Appeal. Nonetheless, even if Mr. Small did so testify during a deposition, his trial testimony is devoid of any mention of receiving consideration in turn for his trial testimony. Therefore, counsel had no reason to impeach Mr. Small. Counsel's performance cannot be deemed deficient for failure to raise a nonmeritorious issue. See Lugo v. State, 2 So. 3d 1, 21 (Fla. 2008); see also Parker v. State, 611 So. 2d 1224 (Fla. 1992). Accordingly, Defendant's fourth ground for relief is denied.

> . . . .

> In ground five, Defendant claims that the State committed a Giglio[] violation when it knowingly presented Mr. Small's allegedly false testimony, as asserted in ground four. Defendant also claims that the State "inflamed the perjury" when it stated during closing arguments that "there was no evidence that [Marcus Small] had any kind of agreement to come in here and testify."

> A successful Giglio claim must show that (1) the testimony given was false; (2) the prosecutor knew the

testimony was false; and (3) the false testimony was material. <u>Guzman v. State</u>, 868 So. 2d 498, 507 (Fla. 2003). Here, as noted in this Court's denial of ground four, there was no false testimony about denying the receipt of consideration in exchange for trial testimony because Mr. Small did not testify at all on this topic. Therefore, Defendant fails to show that the State knowingly presented false testimony. Moreover, when the State argued during closing that there was no evidence that Mr. Small had any kind of agreement to testify at trial, Defense counsel objected to the statement as a mischaracterization of the evidence, and the trial court gave a curative instruction to the jury "to rely upon the evidence as you remember it." Moreover, counsel raised this argument in her October 2, 2009 Motion for New Trial, which was denied by the trial court and affirmed on appeal. "[Q]uestions of law actually decided on appeal must govern the case in the same court and the trial court, through all subsequent stages of the proceedings." <u>McBride</u>, 848 So. 2d at 289. Thus, the law of the case doctrine procedurally bars Defendant from relitigating the same legal issue. Defendant may not seek to avoid this procedural bar by couching his allegations in terms of ineffective assistance of counsel. <u>See</u> <u>Arbelaez</u>, 775 So. 2d 909. Accordingly, Defendant's fifth ground is denied.

Resp. Ex. X at 358-60 (record citations omitted). Petitioner appealed, and the First DCA per curiam affirmed the denial without a written opinion. Resp. Ex. Z.

In his Reply, Petitioner concedes that Small did not testify at trial about not receiving any consideration or deal in exchange for his testimony, and thus Petitioner agrees that counsel cannot be ineffective for failing to impeach Small. Doc. 55 at 96. Thus, the Court need not decide that issue. But Petitioner

50

maintains that the state's comment during closing arguments about Small not receiving consideration for his testimony amounted to a <u>Giglio</u> violation. The Court addresses that claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court defers to the state court's finding that Petitioner cannot demonstrate prejudice from the state's alleged improper comment because trial counsel objected to the statement and the trial court gave a curative instruction for the jurors to rely upon the evidence as they remember it. Resp. Ex. C at 1039. Petitioner cannot show that but for the improper statement, the outcome of his trial would have been different. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Nine is denied.

**I. Ground Ten**

Petitioner argues that his "trial counsel was ineffective for failing to contest the false allegation alleged in Petitioner's affidavit and police report," and that "trial counsel fail[ed] to investigate Petitioner's claim of false allegations." Doc. 1 at 16. Petitioner asserts he raised this claim in "pages 13-15" of his amended Rule 3.850 motion. <u>Id.</u> In his amended Rule 3.850 motion, Petitioner alleged that his trial counsel was ineffective for failing to challenge

false allegations that Petitioner shot Brookins and robbed him because Small,

Mann, and Lee never made any pretrial statements about seeing Petitioner

shoot Brookins. Resp. Ex. X at 168-70.

The trial court denied the claim, finding as follows:

> In ground six, Defendant raises two claims for relief. First, Defendant argues that counsel was ineffective for failing to investigate his case. Specifically, Defendant avers that, had counsel investigated, she would have discovered that State witnesses Mr. Mann, Mr. Lee, and Mr. Small never testified that Defendant shot King Brookins, the second victim in the shootings. Defendant alleges that, but for counsel's failure to investigate, there is a reasonable probability that the result of the trial would have been different.
>
> During trial, none of the three State witnesses testified to witnessing Defendant shoot victim King Brookins. Counsel was well aware of this fact because she crossexamined each of them. The jury nonetheless convicted Defendant. The record therefore refutes Defendant's claim. Furthermore, to the extent that Defendant appears to be attempting to challenge the sufficiency of the evidence produced at trial, Defendant may not challenge the admissibility, validity, or sufficiency of the evidence against him in a motion seeking postconviction relief. Betts v. State, 792 So. 2d 589, 590 (Fla. 1st DCA 2001); Jackson v. State, 640 So. 2d 1173, 1174 (Fla. 2d DCA 1994). Defendant may not seek to avoid this procedural bar by couching his allegations in terms of ineffective assistance of counsel. See Arbelaez, 775 So. 2d at 909.

Resp. Ex. X at 360. Petitioner appealed, and the First DCA per curiam affirmed

the denial without a written opinion. Resp. Ex. Z.

52

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. Petitioner appears to assert that he was wrongly accused of murdering Brookins because there was no evidence or eyewitness account connecting him to that murder, and his trial counsel should have investigated that fact. The state, however, proceeded under a principal theory and presented substantial evidence showing that Petitioner participated in the murders of both Gibson and Brookins. As such, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Ten is denied.

## J. Ground Twelve

Petitioner argues that his appellate counsel was ineffective for failing to argue on direct appeal that the trial court committed fundamental error when it instructed the jury that it could find Petitioner guilty of conspiracy for acts committed "by some other person." Doc. 1 at 18. When instructing the jury on the conspiracy offenses in counts two, three, and four, the trial court, stated the following:

> To prove the crime of conspiracy to traffic in cocaine in Count 2, the State must prove the following two elements beyond a reasonable doubt: The intent of

Lavario Ray was that the offense of trafficking in cocaine would be committed; (2) in order to carry out the intent, Mr. Ray agreed, conspired, combined, or confederated with Andrew Ray to cause trafficking in cocaine to be committed by either of them, or one of them, or **by some other person.**

To prove the crime of conspiracy to traffic in cocaine in Count 3, the State must prove the following two elements: The intent of Mr. Ray was that the offense of trafficking would be committed; (2) in order to carry out the intent, Lavario Ray agreed, conspired, combined, or confederated with Damontrio Glee to cause trafficking in cocaine to be committed by either of them, or one of them, or **by some other person**.

To prove the crime of conspiracy to purchase or possess cocaine with intent to sell in Count 4, the State must prove the following elements beyond a reasonable doubt: (1) The intent of Lavario Ray was that the offense of purchase or possession of cocaine with intent to sell would be committed, and (2) in order to carry out the intent, Lavario Ray agreed, conspired, combined, or confederated with Darius Cooper to cause the purchase or possession of cocaine with intent to sell to be committed by either of them, or one of them, or **by some other person**.

Resp. Ex. C at 1053-54 (emphasis added). Petitioner now argues that the trial court erred in using the language "by some other person," and his appellate counsel should have raised that error on direct appeal.

Petitioner raised this claim in his first petition filed under Rule 9.141 with the First DCA. Resp. Ex. J at 10-12. The state filed a response arguing that trial counsel did not object to the instructions and thus the issues were not preserved for appellate review. Resp. Ex. L at 1-14. The state further argued

that regardless of the lack of appellate preservation, the alleged errors did not

amount to fundamental error and thus appellate counsel did not act

ineffectively for failing to challenge the instructions on appeal. Id. To that end,

the state argued as follows:

> As to Petitioner's claim that the trial court
> fundamentally erred in instructing the jury as to his
> conspiracy offenses by using the phrase "by some other
> person," the State notes that Petitioner has failed to
> provide any authority holding that this phrase
> amounts to fundamental error, nor has the State been
> able to locate any such authority. Additionally, the
> alleged erroneous phrase was a part of the Standard
> Jury Instruction, and was proper. Further, the
> requisites for a finding that Petitioner conspired to
> traffic in controlled substances were properly alleged in
> the charging documents and jury instructions. There
> simply is no requirement that the "some other person"
> portion of the instruction be name specific. It is the act
> of entering into an agreement to traffic in the controlled
> substances with the named co-defendants in each count
> that results in culpability for the conspiracies in this
> case. Moreover, the evidence presented at trial . . .
> clearly established the conspiracy involved, as well as
> the drug trafficking enterprise pursued by Petitioner
> and his codefendants. Thus, there was no error in
> appellate counsel failing to raise a meritless, un-
> preserved claim of error, which did not rise to the level
> of fundamental error.

Resp. Ex. L at 14-15. The state then summarized the evidence presented trial.

Id. at 21-29. The First DCA per curiam denied the petition, with a single citation

to Delva, 575 So. 2d at 643 ("Instructions . . . are subject to the contemporaneous

objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred."). Resp. Ex. N.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court reiterates that "federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, 'so infected the entire trial that the resulting conviction violate[d] due process.'" <u>Jamerson</u>, 410 F.3d at 688 (citation omitted). "If there is no basis in the record for the instruction given, such error may raise a 'substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations,' and reversal may be required." <u>Pesaplastic, C.A. v. Cincinnati Milacron Co.</u>, 750 F.2d 1516, 1525 (11th Cir. 1985) (quoting <u>McElroy v. Firestone Tire & Rubber Co.</u>, 894 F.2d 1504, 1509 (11th Cir. 1990)).

Here, the information for the conspiracy offenses in counts two, three, and four cited § 777.04(3), Florida Statutes. Resp. Ex. B at 122-23. Florida's Standard Jury Instruction for criminal conspiracy under § 777.04(3) contains the language "by some other person." Fla. Std. Jury Instr. 5.3. And the oral and written jury instructions given at trial tracked the language in the standard instruction. Resp. Ex. A at 1543-50; Resp. Ex. C at 1053-56. As such, the instructions were proper, and the Court cannot find that any alleged error so infected the entire trial that Petitioner's resulting convictions amounted to a

due process violation. Thus, Petitioner has failed to demonstrate that his appellate counsel was ineffective for failing to raise this issue on appeal. Upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. See 28 U.S.C. § 2254(d). Ground Twelve is denied.

**K. Ground Thirteen**

Petitioner asserts his appellate counsel was ineffective for failing to raise a claim on direct appeal that the "trial court committed fundamental error where jury was instructed on principal instructions given in connection with conspiracy counts in which Petitioner was charged." Doc. 1 at 19. At trial, after instructing the jury on the elements of the charged offenses, but before instructing on the lesser included offenses, the court read the following instruction on principals:

> If the defendant helped another person or persons commit a crime, the defendant is a principal and must be treated as if he had done all the things the other person or persons did if the defendant had a conscious intent that the criminal act be done and [] the defendant did some act or said some word which was intended to and which did incite, cause, encourage, assist, or advise the other person or persons to actually committed [sic] the crime. To be a principal, the defendant does not have to be present when the crime is committed.

Resp. Ex. C at 1063. Petitioner now argues that this principal instruction should not have applied to the conspiracy crimes in counts two, three, and four, and his appellate counsel was ineffective for failing to make that argument on appeal.

Petitioner raised this issue in his first petition filed under Rule 9.141 with the First DCA. Resp. Ex. J at 12-15. In his petition, he asserted that using the principal theory to establish the conspiracy charges violated the Third District Court of Appeal's ruling in Evans v. State, 985 So. 2d 1105 (Fla. 3d DCA 2007), in which the Third DCA held that instructing the jury on the principal theory for conspiracy charges prejudiced the defendant and warranted a new trial. Resp. Ex. J at 14. The state filed a response to Petitioner's claim, arguing as follows:

> With respect to his claim that the trial court fundamentally erred in instructing the jury as to the principals theory, in support of his assertion, Petitioner cites to Evans v. State, 985 So. 2d 1105 (Fla. 3d DCA 2007). In Evans, the Third District Court of Appeal held that the defendant's appellate counsel erred in failing to argue on appeal that the trial court erred in overruling an objection made by trial counsel that the jury should not have been instructed on the principals theory of culpability. The Evans decision, however, is distinguishable from the instant case, thus inapplicable. The primary distinction between Evans and this case is the fact that there was no objection raised in the lower court here, which would have preserved any such claim, as was the case in Evans. Moreover, although the Third District held that the

principals instruction should not have been read in the lower court, the State argues that the basis for that decision is faulty, and the ultimate finding inapposite to the case sub judice.

In <u>Evans</u>, the defendant was tried on various conspiracy counts, and argued appellate counsel rendered ineffective assistance for failing to argue on appeal that the trial court erred in overruling a defense objection pertaining to the giving of the principals instruction in connection with his conspiracy charges. <u>Id.</u> at 1105. In finding that the principals instruction should not have been read in the lower court, the Third District began its analysis by referring to its prior decision in <u>Ramirez v. State</u>, 371 So. 2d 1063 (Fla. 3d DCA 1979), in which the court held that evidence of a person aiding and abetting another in the commission of an offense is insufficient to convict a person of conspiracy. <u>Id.</u> at 1106, quoting <u>Ramirez</u>, 371 So. 2d at 1065. The court also noted that:

> In <u>Ramirez</u> the defendant and his codefendants were apprehended after their boats, containing nine and one-half tons of marijuana, ran aground in Miami-Dade County. There was ample evidence that Ramirez and three codefendants had aided and abetted the commission of the offense of unlawful possession of over one hundred pounds of marijuana. However, this court ruled that acts of aiding and abetting "cannot, without more, also make each actor a principal in the crime of conspiracy to commit such offense . . . ."

<u>Id.</u> at 1107, quoting <u>Ramirez</u> at 1066. Based on the <u>Ramirez</u> decision, the Third District, without further analysis, then held in <u>Evans</u> that "the principal instruction should not have been given in connection with the conspiracy charges." <u>Id.</u> The <u>Ramirez</u> opinion, however, contained very few facts and did not pertain

59

to the impropriety of giving the principals instruction in the context of a defendant being charged with numerous offenses, some of which were conspiracy charges. To the contrary, the <u>Ramirez</u> court found that the defendants' culpability could not be based on the principal theory because the only evidence incriminating the defendants was their possession of the contraband. In other words, there was no other evidence presented in <u>Ramirez</u> which showed that either defendant had conspired to commit the substantive offense of possessing the contraband. Thus, the analysis in <u>Ramirez</u> focused on a sufficiency of the evidence to support a charge, not the propriety of whether the giving of the principals instruction amounts to per se reversible error where a defendant is charged with, among other things, various conspiracy offenses. To that extent, <u>Ramirez</u> has no applicability to the case sub judice.

As further support for its holding that, "the principal instruction should not have been given in connection with the conspiracy charges," the Third District in <u>Evans</u> stated that the Fourth District Court of Appeal had similarly made the same decision in <u>Pisegna v. State</u>, 488 So. 2d 624, 625 (Fla. 4th DCA 1986). <u>Pisegna</u>, however, did not provide for the black letter holding implied by the Third District. To the contrary, in <u>Pisegna</u>, the defendant was charged with trafficking in cocaine (Count One); conspiracy to traffic in cocaine (Count Two); and possession of a controlled substance, to-wit: cocaine (Count Three). <u>Id.</u> at 625. The trial court granted a motion of acquittal as to Count One, but denied the motion as to the conspiracy count based on "statements" made by the defendant following his arrest. <u>Id.</u> With respect to the jury being instructed on the principals theory, the Fourth District conducted no analysis, nor did the court provide any further factual details prior to holding:

> We also note that the trial court erred by instructing the jury on "principals" despite

the fact that the court had granted the defendant's motion for judgment of acquittal on the substantive count of trafficking in cocaine.

Id. [ ]. In other words, the Fourth District held that the principals instruction should not have been read to the jury given the fact that the defendant had been acquitted of the underlying offense for which he was alleged to have conspired. The Fourth District's decision, however, does not provide for the per se proposition for which the Third District cites in rendering its decision in Evans.

Of primary distinction between Evans and the instant case, is the fact that there was no objection made by defense counsel at trial as to the jury instructions. To the contrary, there was an affirmative [] acquiescence made by defense counsel to the instructions as read, with knowledge that the principals instruction was being provided to the jury. Thus, any claim relating to the jury instructions was not preserved for appellate review.

It is the State's position that the Evans decision, to the extent Petitioner alleges it provides for a general proposition that it is error for a jury to be instructed on the principals theory in any case where a defendant is charged, at least in part, with conspiracy offenses, was wrongly decided. Neither Ramirez, nor Pisegna provide for the findings for which they were cited by the court in Evans. Further, the failure to object to the instructions as provided, as noted supra, failed to preserve the issue for appellate review. In order to have prevailed on such a claim of un-preserved error, appellate counsel would have had to establish the error amounted to fundamental error. Petitioner has failed to cite any authority holding that fundamental error occurred in this case, nor does the record support such a conclusion, since, even assuming arguendo occurred [sic], it did not vitiate the entirety of Petitioner's trial.

61

Moreover, Petitioner has similarly failed to establish any prejudice to his case as a result of the subject claim not being raised by appellate counsel. As noted supra, no objection to the instructions was raised at any point in the lower court. Since jury instructions are subject to the contemporaneous objection rule, such a claim would have been wholly un-preserved for appellate review. As a result, the only argument appellate counsel would have been able to raise is that the instructing of the jury amounted to fundamental error. The Evans case, quite simply, does not make such a holding, nor has the State been able to locate any such authority holding the giving of the principals instruction amounts to, per se, reversible error where a defendant is charged, in part, with conspiracy offenses. Thus, Petitioner has failed to provide any authority supporting a claim of fundamental error, upon which appellate counsel could have relied. Also, in the instant case, unlike in Ramirez and Pisegna, there was ample evidence establishing Petitioner's role as a leader of the various conspiracies for which he was charged, not just as an aider and abettor; and a lack of acquittal regarding the underlying offenses for which the conspiracies were based. Also, Petitioner was not charged with just conspiracy offenses. To the contrary, Petitioner was charged with substantive offenses, with the jury convicting Petitioner as charged on all of his various counts. Petitioner was a leader, organizer, instigator and perpetrator of the underlying conspiracies, and substantive offenses, including the first degree premeditated murders. Specifically, the evidence presented at trial clearly demonstrated that Petitioner was not an ancillary, nonessential player in the various offenses for which he was charged.

Resp. Ex. L at 15-21. The state then summarized the evidence presented trial showing that Petitioner did not just act as a principal to the conspiracies. Id. at 21-29. The First DCA per curiam denied the petition, with a single citation to

62

<u>Delva</u>, 575 So. 2d at 643 ("Instructions . . . are subject to the contemporaneous objection rule, and, absent an objection at trial, can be raised on appeal only if fundamental error occurred."). Resp. Ex. N.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that it will not consider any argument that the reading of the principal instruction violated state law. And it repeats that "federal courts on habeas review are constrained to determine only whether the challenged instruction, viewed in the context of both the entire charge and the trial record, 'so infected the entire trial that the resulting conviction violate[d] due process.'" <u>Jamerson</u>, 410 F.3d at 688 (citation omitted). Here, the Court finds that the reading of the principal theory did not affect the outcome of Petitioner's trial as the state presented evidence that Petitioner was a main actor in the conspiracy offenses in counts two, three, and four. As to count two, Detective Cook testified that Andrew Ray took part in Petitioner's cocaine enterprise and Ray often supplied Petitioner with the cocaine Petitioner passed along to his distributors. Resp. Ex. C at 321-22. As to count three, the state presented recorded telephone calls between Petitioner and Glee in which they discuss the buying and selling of cocaine. <u>Id.</u> at 268, 288. Likewise, as to count four, the state presented recorded telephone calls between Petitioner and Darius Cooper preparing Cooper for future sales of cocaine to various buyers and arranging those sales.

<u>Id.</u> at 296-97, 325. On this record, there was evidence to support a conviction for the criminal conspiracy counts without applying the principal theory. And thus, Petitioner has failed to demonstrate that but for appellate counsel's alleged error, the outcome of his appeal would have been different. Petitioner's resulting convictions did not amount to a due process violation, and upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of <u>Strickland</u>, and it was not based on an unreasonable determination of the facts given the evidence presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Thirteen is denied.

## L. Ground Fourteen

Petitioner argues that his appellate counsel was ineffective for failing to raise a claim on direct appeal that "trial counsel was ineffective at trial when failing to object to a <u>Giglio</u> violation apparent on the face of the record." Doc. 1 at 19. Petitioner raised this claim in his first petition filed under Rule 9.141 with the First DCA. Resp. Ex. J at 15-19. In the petition, he claimed that Detective Cook's testimony that during his first interview of Petitioner following his arrest, Petitioner advised that his phone calls were about "selling hats" amounted to perjury, and appellate counsel should have challenged trial counsel's failure to object to the statement under <u>Giglio</u>. <u>Id.</u> The First DCA did

not direct the state to respond to this argument and summarily denied the claim.[15] Resp. Exs. K, N.

The Court addresses the claim in accordance with the deferential standard for federal court review of state court adjudications. In doing so, the Court notes that in Florida, ineffective assistance of trial counsel claims are generally not cognizable on direct appeal and must be raised in postconviction proceedings. See Reynolds v. State, 99 So.3d 459, 474 (Fla. 2012) (noting how "claims of ineffective assistance of counsel generally are not cognizable on direct appeal and are properly raised in postconviction proceedings"). Thus, appellate counsel is not ineffective for failing to raise a non-cognizable claim during Petitioner's direct appeal. In any event, considering the evidence presented at trial and the record as a whole, the challenged statement did not amount to a Giglio violation as it was not material, and it did not affect the outcome of Petitioner's case. As such, upon thorough review of the record and the applicable law, the Court finds that the state court's decision to deny Petitioner's claim was neither contrary to nor an unreasonable application of Strickland, and it was not based on an unreasonable determination of the facts given the evidence

---

[15] The First DCA directed the state to respond to Petitioner's claims about appellate counsel's failure to challenge the jury instructions and summarily denied all other claims. Resp. Ex. K.

presented to the state court. <u>See</u> 28 U.S.C. § 2254(d). Ground Fourteen is denied.

## M. Grounds Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, and Twenty-Two

In these grounds, Petitioner raises additional claims of ineffective assistance of appellate counsel. Doc. 1 at 21-24. In Ground Fifteen, he asserts appellate counsel was ineffective for failing to argue on direct appeal that the trial court erred in denying his motion for new trial. <u>Id.</u> at 21 (citing Resp. Ex. DD at 5-7). In Ground Sixteen, he contends appellate counsel failed to argue that the state did not prove the elements of each charged offense. <u>Id.</u> (citing Resp. Ex. DD at 7-11). In Ground Seventeen, Petitioner argues appellate counsel failed to raise a claim challenging the trial court's misleading verbal instruction on discharging or possessing a firearm during the first degree murders. <u>Id.</u> at 22 (citing Resp. Ex. DD at 11-13). In Ground Eighteen, he claims appellate counsel failed to challenge on direct appeal Detective Cook's testimony about Petitioner "selling hats," arguing the testimony was a <u>Richardson</u> and <u>Giglio</u> violation. <u>Id.</u> at 22 (citing Resp. Ex. DD at 13-20). In Ground Nineteen, Petitioner asserts appellate counsel failed to raise a claim challenging the state's improper closing arguments. <u>Id.</u> at 23 (citing Resp. Ex. DD at 20-22). In Ground Twenty, Petitioner claims appellate counsel failed to raise a claim that the trial court erred in denying Petitioner's motions to

suppress cell site data and wiretap evidence. <u>Id.</u> (citing Resp. Ex. DD at 23-28). In Ground Twenty-One, he contends appellate counsel failed to argue on direct appeal that the state "constructively amended the [i]ndictment" when it argued during closing that Petitioner conspired with Glee to commit the murders. <u>Id.</u> (citing Resp. Ex. DD at 28-30). Finally, in Ground Twenty-Two, he claims appellate counsel failed to argue that the verdict should have been set aside where it was unclear what theory the jury relied on to convict Petitioner of the first degree murders. <u>Id.</u> (citing Resp. Ex. DD at 30-39).

Petitioner raised these claims in his second petition filed under Rule 9.141. <u>See generally</u> Resp. Ex. DD. The First DCA dismissed the second petition "as untimely and successive" under Florida Rule of Appellate Procedure 9.141(d)(5) and (d)(6)(C). Resp. Ex. EE. Respondents argue that these claims are now procedurally barred from this Court's consideration because the First DCA dismissed Petitioner's second Rule 9.141 petition on an independent and adequate state procedural ground. Resp. at 133-49. In his Reply, Petitioner admits that the First DCA "clearly and expressly state[d] its denial of [his] second petition for state habeas corpus review rested on an independent and adequate state procedural rule," but asks the Court to ignore the procedural bar because Respondents did not raise this defense in the motion to dismiss that Respondents filed as their initial Response. Doc. 55 at 34.

When Respondents first responded to the Petition, they moved to dismiss the case without prejudice, advising the Court that the state appellate court reversed the trial court's denial of Petitioner's Rule 3.800(a) motion, and ordered that the trial court resentence Petitioner on the conspiracy to purchase or possess cocaine with intent to sell in No. 16-2005-CF-4840-BXXX. Doc. 26. And because Petitioner's state court resentencing was pending when he initiated this action, Respondents argued this case was premature. Id. But Respondents' request to dismiss without prejudice to Petitioner refiling a habeas case following resentencing indicates they were reserving their right to raise any potential defenses until Petitioner's claims were ripe for consideration. Also, when the Court denied Respondents' initial request for dismissal, they filed their Supplemental Response and gave Petitioner ample notice of their procedural default arguments for Grounds Fifteen through Twenty-Two, and Petitioner was offered a chance to reply and argue why the Court should overlook the procedural default. But rather than raising a proper argument to overcome the defaults, Petitioner claims Respondents intentionally waived the defenses. The Court finds Petitioner's argument unpersuasive. See, e.g., Magouirk v. Phillips, 144 F.3d 348, 359 (5th Cir. 1998) (holding that the plaintiff "was afforded both notice and a reasonable opportunity to oppose" procedural default when he had a chance to object to

magistrate judge's report and recommendation that "placed [him] on notice that procedural default was a potentially dispositive issue").

The state appellate court dismissed these claims on an independent and adequate state procedural ground. Maples v. Thomas, 565 U.S. 266, 280 (2012); Rogers v. Sec'y, Dep't Corr., 829 F. App'x 437, 444 (11th Cir. 2020) ("Fla. R. App. P. 9.141(d)(5) is an independent and adequate state procedural ground that is firmly established and regularly followed."). And there is no evidence that the state court applied its procedural rule in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." Judd v. Haley, 250 F.3d 1308, 1313 (11th Cir. 2001). Thus, the claims in Grounds Fifteen through Twenty-Two are procedurally barred from federal habeas consideration. Petitioner fails to argue cause for or prejudice from these procedural defaults, nor does he claim that failure to consider the merits of these claims will lead to a fundamental miscarriage of justice. Grounds Fifteen, Sixteen, Seventeen, Eighteen, Nineteen, Twenty, Twenty-One, and Twenty-Two are denied.

## V.   **Motion for Actual Innocence**

Petitioner has also filed a "Motion for Consideration of Actual Innocence as a Gateway Pursuant to Schlup v. Delo," in which he raises for the first time three claims of newly discovered evidence. See Doc. 60. As an initial matter, because Respondents filed their Supplemental Response more than two years before Petitioner filed this Motion, Petitioner should have sought leave to

amend his Petition before raising these new claims. <u>See</u> Docs. 49; <u>see also</u> Fed. R. Civ. P. 15(a)(2) ("a party may amend its pleading only with . . . the court's leave. The court should freely give leave when justice so requires."). Also, Petitioner admits he did not raise these new claims in state court, and thus acknowledges that they are unexhausted and procedurally defaulted.[16] Doc. 60 at 2-5. He, however, attempts to overcome that procedural bar by claiming that these claims of newly discovered evidence show he is actually innocent, and a fundamental miscarriage of justice will result if the claims are not addressed on the merits. <u>Id.</u> In the interests of justice, and despite the improper procedural posture of these belated claims, the Court will consider whether these claims meet the "extraordinary" standard contemplated in <u>Schlup</u>.

A petitioner may obtain review of the merits of a procedurally barred claim to remedy a fundamental miscarriage of justice if he satisfies the actual innocence "gateway" established in <u>Schlup</u>, 513 U.S. at 298. "The '<u>Schlup</u> gateway' is meant to prevent a constitutional error at trial from causing a 'miscarriage of justice' and 'the conviction of one who is actually innocent.'"

---

[16] Petitioner likely did not attempt to exhaust his newly discovered evidence claims with the state court because in January 2019, the trial court cautioned Petitioner that additional frivolous postconviction motions may subject him to sanctions, including the prohibition of pro se filings. <u>See</u> No. 2005-CF-4840-BXXX. And in December 2019, the First DCA barred Petitioner from filing with the First DCA future pro se pleadings related to either of Petitioner's state court cases, explaining "Petitioner's repetitious, frivolous filings have become an abuse of the legal process . . . ." <u>See</u> <u>Ray v. State</u>, No. 1D19-1372 (Fla. 1st DCA Dec. 31, 2019). Petitioner filed his Motion for Actual Innocence with the Court on October 18, 2022. <u>See</u> Doc. 60.

Kuenzel v. Comm'r, Ala. Dep't of Corr., 690 F.3d 1311, 1314 (11th Cir. 2012) (per curiam) (quoting Schlup, 513 U.S. at 324); see Johnson v. Alabama, 256 F.3d 1156, 1171 (11th Cir. 2001) (citations omitted) (recognizing that the fundamental miscarriage of justice exception is only available in extraordinary cases upon a showing of "actual innocence" rather than mere "legal innocence"). "To meet this standard, a petitioner must 'show that it is more likely than not that no reasonable juror would have convicted him' of the underlying offense." Johnson, 256 F.3d at 1171 (quoting Schlup, 513 U.S. at 327). Additionally, "'[t]o be credible,' a claim of actual innocence must be based on reliable evidence not presented at trial." Calderon v. Thompson, 523 U.S. 538, 559 (1998) (quoting Schlup, 513 U.S. at 324). With the rarity of such evidence, in most cases, allegations of actual innocence are summarily rejected. Schlup, 513 U.S. at 324.

First, Petitioner asserts he has received new evidence showing he is actually innocent of the first degree murder convictions. Doc. 60 at 6. According to Petitioner, in April 2022, Petitioner's cousin Jesse Cushion contacted him and advised that Marcus Small executed an affidavit recanting his trial testimony and directed Petitioner to contact co-defendant Glee for a copy of Small's affidavit. Id. at 9. Petitioner obtained a copy of the affidavit and attaches it to support his assertion. See Doc. 61.

In the affidavit, Small states he was an eyewitness to the murders of Larry Gibson and King Brookins. Doc. 61-1 at 1. He explains that JSO contacted

him about the murders and asked him and his mother to appear at the police station for questioning. Id. According to Small,

> my mother and I arrived at the police memorial building only because Jacksonville Sheriff Office promised me that I would not be charged for causing the death of both Larry Gibson and King Brookins if I testify that I observed Damontrio Glee and Lavario Ray cause the death of both Larry Gibson and King Brookins[.] [T]herefore on this same date I provided a false statement as to seeing Mr. Glee and Mr. Ray cause the death of both victims.
>
> [ ] I repeated the false statement during Mr. Glee and Mr. Ray['s] trial. I provided false testimony as witnessing Glee being at the scene of the crime; and Mr. Glee shooting and killing Mr. Gibson. Although I saw Mr. Ray with a gun I never actually saw him shoot either victim.
>
> [On the day of the murders], I observed Andrew Stephens shoot and kill Mr. Gibson in the living room of the home[.] [P]rior to shooting Mr. Gibson[,] I observed Mr. Stephens firing shots at Mr. Brookins in the dining room. I also observed Mr. Ray running from the kitchen area of the home into the living room with a gun in his hand. Andrew told Mr. Ray "to tighten up before I kill your ass." He said this pointing the gun at Mr. Ray and then instructed everyone at gun point to move the victims' bodies.
>
> Mr. Stephens and Mr. Ray were the only two individual[s] I observed with [] guns including the victims King Brookins at the home of the shooting.
>
> I also heard later from a few individuals in the neighborhood that Mr. Lee provided testimony to seeing Mr. Glee and Mr. Ray cause the death of Mr. Gibson. This could not be true. I observed Mr. Lee asleep on the couch before and during the incident. I

> awoke him personally afterwards to help me move the
> victims' bodies.

Doc. 61-1.[17] Petitioner argues that this new evidence shows he is actually

innocent of the murders because Small now admits he was promised immunity

for his testimony, and if trial counsel was able to cross-examine Small on that

issue and inform the jury of this information, there is a reasonable probability

that the result of his trial would have been different. Doc. 60 at 10-11. Petitioner

also asserts that Small's affidavit contradicts other testimony showing

Petitioner participated in the murder. Id. at 12.

The Court cannot find that this alleged recantation alone constitutes

"new reliable evidence" that demonstrates no reasonable juror would have

found Petitioner guilty of the first degree murders. Indeed, the Eleventh Circuit

has repeatedly noted that "recantations are viewed with extreme suspicion by

the courts." In re Davis, 565 F.3d 810, 825 (11th Cir. 2009) (quoting United

States v. Santiago, 837 F.2d 1545, 1550 (11th Cir. 1988)); United States v.

Smith, 433 F.2d 149, 150-51 (5th Cir. 1970) (quoting Newman v. United States,

238 F.2d 861, 862 n.1 (5th Cir. 1956)); United States v. Dumas, 280 F. App'x

848, 852 (11th Cir. 2008). This is so because recantation testimony "upsets

---

[17] In March 2022, co-defendant Damantrio Glee, with help from counsel, filed a Rule 3.850 motion in state court relying on Small's same affidavit to support a claim of newly discovered evidence. See State v. Glee, Nos. 16-2005-CF-5567-BXXX, 16-2005-CF-4840-AXXX (Fla. 4th Cir. Ct.). His motion is still pending.

society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction." In re Davis, 565 F.3d at 825 (quoting Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting)). Here, Small signed the affidavit on August 1, 2021, over eleven years after Petitioner's trial, see Doc. 61-1, and the existence of such a long delay in coming forward renders Small's recantation inherently suspect.

Further, as to Small's statements about having an oral agreement with the police in exchange for an interview, that account only goes to Small's credibility and does not establish Petitioner's "actual innocence." Also, while Small testified at trial that he saw Petitioner shoot Gibson, Small's new statement that he never saw Petitioner shoot is not dispositive of Petitioner's innocence. Indeed, the physical evidence presented at trial shows two handguns were used during the murders, which supports Small's affidavit that he saw only two guns at the scene and Petitioner was one of the two individuals in possession of a gun. Also, Small's affidavit does not contradict evidence supporting the theories of felony murder or that Petitioner was acting as a principal. It also does not contradict the other eyewitness testimony of Mann and Lee. There is a presumption that the jury resolved any conflicting inferences in the evidence, and the Court defers to the jury's finding that

Petitioner committed the first degree murders either under the theory of premeditation, felony murder, or while acting as a principal to the crime.

Second, Petitioner contends he has received newly discovered evidence in the form of an affidavit from his childhood friend Corey Outlaw. Doc. 60 at 15. According to Petitioner, in September 2020, he received an affidavit from Outlaw explaining that in 2004-2005, while Outlaw was in federal prison serving a 330-month term of incarceration, law enforcement officers contacted him about assisting them in their drug investigation involving Petitioner. Id. at 15. In the affidavit, Outlaw states he had several meetings with officers and agreed to cooperate in their arrest and conviction of Petitioner. Doc. 60-14 at 2. According to Outlaw, he assured officers that he "had pertinent information in regards to their investigation, and that [he] could obtain any information that they were seeking on account of the longstanding friendship that [Petitioner] and [he] had going back to the ages of 7 or 8 years old." Id. Outlaw explains that he also told officers he would appear before a grand jury or testify in court to help obtain Petitioner's conviction. Id. Outlaw states, however, that officers "failed to move forward with the assistance that [he] was willing and able to provide" and stopped contacting Outlaw "for reasons unbeknownst to him." Id. According to Petitioner, Outlaw's affidavit proves that Detective Cook willfully and deliberately lied in the application for the wiretap intercept when advising the court about sources' unwillingness to cooperate, and had the court known

about Outlaw's cooperation, the application would have lacked the necessary probable cause. <u>See</u> Doc. 60 at 16-17. He asserts that had the court been aware of Outlaw, the wiretap evidence and most of the state witnesses' trial testimony would have been suppressed. <u>Id.</u> at 25-26.

Petitioner's argument here challenges the sufficiency of the wiretap application, which cannot support an actual innocence claim. <u>See</u> <u>Bousley v. United States</u>, 523 U.S. 614, 623 (1998) ("It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency."). Outlaw's affidavit is not "new evidence" affirmatively demonstrating Petitioner's factual innocence but instead challenges the legal sufficiency of how the state obtained evidence supporting Petitioner's guilt.

Finally, Petitioner argues he has received newly discovered evidence establishing prosecutorial misconduct and a <u>Brady</u>[18] violation "where state failed to disclose exculpatory impeachment evidence regarding its own corrupt method of commencing prosecutions . . . ." Doc. 60 at 27. In support of this claim, Petitioner contends that in October 2021, an individual mailed Petitioner news articles about former State Attorney Angela Corey being indicted for "falsifying arrest warrant affidavits and for withholding crucial exculpatory evidence in George Zimmerman's case." <u>Id.</u> at 28. He also states that in December 2021, he

---

[18] <u>Brady v. Maryland</u>, 373 U.S. 83 (1962).

obtained a "Sworn Complaint," Doc. 60-6, filed by a prisoner in 2007, alleging that the state attorney's standard operating procedure is to use false notary stamps and signatures on their charging instruments and to withhold relevant discovery. Doc. 60 at 29-30. He claims the state engaged in misconduct during his prosecution by using illegally obtained wiretap evidence during the grand jury investigation, lying to the trial court about disclosing all evidence to Petitioner, and failing to provide Petitioner with state witnesses' files containing relevant impeachment evidence. Id. at 31-32. He argues that had he known of this evidence at the time of trial, "the integrity of the entire criminal proceeding may have been called into question," and no reasonable juror would have found Petitioner guilty of murder. Id. at 33-34.

These news articles and documents criticizing the state attorney's office are not "new evidence" affirmatively demonstrating Petitioner's factual innocence. Indeed, the documents for which Petitioner relies do not pertain to Petitioner or his cases and his attempt to draw a connection is weak. Petitioner claims that had the jury known about the public criticism of the state attorney, it would have disregarded the large amount of evidence showing Petitioner participated in the crimes for which he was convicted. But he has not produced exculpatory evidence, trustworthy eyewitness accounts, or critical physical evidence not previously available. He has failed to point to any evidence to show

it is more likely than not that no juror, acting reasonably, would have found him guilty beyond a reasonable doubt because of this "new evidence."

In sum, the Court rejects Petitioner's three actual innocence arguments and finds they do not present an "extraordinary" case under the <u>Schlup</u> standard. As such, these newly discovered evidence claims are unexhausted and procedurally defaulted. Petitioner has failed to show either cause or prejudice from the default, or that a fundamental miscarriage of justice will result if the claims are not addressed on the merits. Therefore, he is not entitled to federal review of these claims.

Accordingly, it is

**ORDERED AND ADJUDGED**:

1.     The Petition (Doc. 1) is **DENIED** and this case is **DISMISSED with prejudice**.

2.     Petitioner's "Motion for Consideration for Actual Innocence as a Gateway Pursuant to <u>Schlup v. Delo</u>" (Doc. 60) is **DENIED**.

3.     Petitioner's Motion for Partial Summary Judgment (Doc. 58) is **DENIED**.[19]

---

[19] Petitioner moves for summary judgment on his claim that the wiretap application and order approving the wiretap was obtained by means of fraud, deceit, and mistake. Doc. 58. The Court found Petitioner's argument to be without merit in its analysis and denial of Ground Four of the Petition.

4.    The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

5.    If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[20]

**DONE AND ORDERED** at Jacksonville, Florida, this 6th day of March, 2023.



TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C:    Lavario C. Ray, #J14207
Anne Catherine Conley, Esq.

---

[20] The Court should issue a certificate of appealability only if Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.